# IN THE SUPREME COURT OF TENNESSEE
# AT NASHVILLE
September 6, 2017 Session Heard at Knoxville[1]

## STATE OF TENNESSEE v. LINDSEY BROOKE LOWE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Sumner County**
**No. 2011CR834      Dee David Gay, Judge**

---

### No. M2014-00472-SC-R11-CD

---

A jury convicted the Defendant, Lindsey Brooke Lowe, of two counts of first degree premeditated murder, two counts of first degree felony murder, and two counts of aggravated child abuse, all arising from the Defendant's smothering to death her newborn infant twins. The trial court merged the alternative counts of first degree murder as to each victim and sentenced the Defendant to two terms of life imprisonment for the murders and two terms of twenty-five years for the aggravated child abuse convictions, all to be served concurrently. On direct appeal, the Court of Criminal Appeals affirmed the Defendant's convictions and sentences. We granted the Defendant's application for permission to appeal in order to address the following issues raised by the Defendant: (1) whether the Exclusionary Rule Reform Act, codified at Tennessee Code Annotated section 40-6-108 ("the ERRA"), violates the Tennessee Constitution's Separation of Powers Clause; (2) whether the trial court erred by relying on the ERRA to deny the Defendant's motion to suppress the evidence gathered at her house pursuant to a search warrant that did not conform with the technical requirements of Tennessee Rule of Criminal Procedure 41; (3) whether the trial court erred by ruling inadmissible certain expert testimony proffered by the defense during the hearing on the Defendant's motion to suppress her statement to Detective Malach; (4) whether the trial court erred by denying the Defendant's motion to suppress her statement; and (5) whether the trial court erred by prohibiting the Defendant's expert witness from testifying at trial about the reliability of her responses to Detective Malach's questions. We also directed the parties to address the additional issue of whether the good-faith exception to the exclusionary rule adopted by this Court in State v. Davidson, 509 S.W.3d 156, 185-86 (Tenn. 2016), should be expanded to include clerical errors made by the issuing magistrate when the search in question is otherwise constitutional. We hold that the ERRA represents an impermissible encroachment by the legislature upon this Court's authority and

---

[1] We heard oral argument in this case at the University of Tennessee College of Law.

responsibility to adopt exceptions to the exclusionary rule and, therefore, violates the Tennessee Constitution's Separation of Powers Clause; that the exclusionary rule should not be applied to suppress evidence gathered pursuant to a search warrant that is technically defective under Rule 41 due to the magistrate's simple and good-faith clerical error of incorrectly indicating on one of three copies of the warrant that it was issued at 11:35 "PM" while correctly indicating on the other two copies that it was issued at 11:35 "AM"; that the trial court did not err in ruling inadmissible the defense expert's testimony at the hearing on the Defendant's motion to suppress her statement, although the trial court should have allowed defense counsel to proffer the testimony in a question and answer format; that the trial court did not err in ruling that the Defendant was not in custody at the time she made her statement to Detective Malach, rendering moot any claimed defects in the administration of Miranda warnings prior to her statement being made; and that the trial court did not commit reversible error in ruling inadmissible at trial certain proffered expert testimony by a defense witness. In sum, we affirm the Defendant's convictions and sentences.

**Tenn. R. App. P. 11 Appeal by Permission;
Judgment of the Court of Criminal Appeals Affirmed**

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

David L. Raybin (on appeal), Nashville, Tennessee; John Pellegrin (at trial and on appeal) and James Ramsey (at trial), Gallatin, Tennessee, for the appellant, Lindsey Brooke Lowe.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Leslie E. Price, Senior Counsel; Lawrence Ray Whitley, District Attorney General; and C. Ronald Blanton, Assistant District Attorney General, for the appellee, the State of Tennessee.

Jonathan Harwell, Knoxville, Tennessee, and Richard L. Tennent, Nashville, Tennessee, for amicus curiae, Tennessee Association of Criminal Defense Lawyers.

**OPINION**

**Factual and Procedural Background**

In September 2011, the Defendant was twenty-five years old, had graduated from college, and was engaged to be married. She was employed in the office of a dental practice and was living with her parents, Mark and Paula Lowe, and her younger sister, Lacey, in the Lowes' home. The Defendant's bedroom was upstairs, as was Lacey's, and the two sisters shared a bathroom.

In late December 2010 or early January 2011, the Defendant became pregnant with twins by a man not her fiancé. The Defendant concealed her pregnancy. During the night of Monday, September 12, 2011, the Defendant gave birth to twin boys, unassisted, in the bathroom she shared with her sister. The Defendant concealed the births from her family members and cleaned up the bathroom before her sister used it on the morning of the 13th. The Defendant texted her supervisor on the morning of the 13th and stated that she would not be into the office that day due to illness. One day later, on Wednesday, September 14, 2011, the Defendant reported to work as usual.

That same morning, after the Defendant left for work, the Defendant's mother discovered one of the infant boys in a laundry basket in the Defendant's bedroom. Mr. Lowe contacted the police. Several police officers and emergency medical personnel arrived and determined that the boy was dead.

A "death investigation" ensued. Detective Steve Malach, after briefly viewing the boy's body, departed the Lowes' house to go to the Defendant's workplace. Although Mr. Lowe reportedly consented to the police officers' searching his house, the police began the process of obtaining a search warrant for the Lowe residence. After obtaining the warrant late in the morning on the 14th, the police obtained numerous items from the Lowe residence.

In the meantime, Detective Malach drove to the dental practice where the Defendant was employed and, after introducing himself, was taken to meet the Defendant. Detective Malach spoke briefly to the Defendant at her workplace and then requested that she come to the police department to be interviewed. The Defendant agreed, and she accompanied Detective Malach in Detective Malach's car to police headquarters. During the ensuing interview, the Defendant explained that she had given birth to not just one, but actually two infants. Upon learning this information, Detective Malach immediately paused the interview so that he could alert the officers still at the Lowe residence about the existence of another infant. Subsequently, officers found a second deceased boy at the bottom of the same laundry basket.

In response to Detective Malach's questions about how the boys died, the Defendant explained that she had placed her hand over each one's mouth in order to stifle his cries. She acknowledged that, by doing so, she smothered each boy to death. She later placed their bodies, as well as the single placenta, in her laundry basket. She then proceeded to clean up the bathroom. She stayed home on Tuesday, September 13, 2011, in order to recover from the deliveries. At no time during these events did the Defendant inform any family member as to what had happened nor did she call for medical assistance.

After Detective Malach completed interviewing the Defendant, he arranged for the Defendant to be taken to the hospital to be checked for complications following her

3

deliveries. The Defendant later was arrested at the hospital and subsequently indicted for two counts of first degree premeditated murder, two counts of first degree felony murder in the perpetration of aggravated child abuse, and two counts of aggravated child abuse.[2]

Prior to trial, the Defendant moved to suppress (1) her statement to Detective Malach and (2) the evidence obtained pursuant to the search warrant. After evidentiary hearings, the trial court denied both motions, and the matter proceeded to a jury trial. The jury convicted the Defendant as charged. The trial court merged the two first degree murder convictions as to each child and sentenced the Defendant to life imprisonment for each murder conviction. The trial court subsequently sentenced the Defendant to twenty-five years' imprisonment for each of the aggravated child abuse convictions, and ordered all of the sentences to be served concurrently. On direct appeal, the Court of Criminal Appeals affirmed the trial court's judgments. State v. Lowe, No. M2014-00472-CCA-R3-CD, 2016 WL 4909455, at *48 (Tenn. Crim. App. July 12, 2016), perm. appeal granted (Tenn. Jan. 18, 2017).

We granted the Defendant's application for permission to appeal in order to address the following issues: (1) whether the Exclusionary Rule Reform Act, codified at Tennessee Code Annotated section 40-6-108 ("the ERRA"), violates the Tennessee Constitution's Separation of Powers Clause; (2) whether the trial court erred by relying on the ERRA to deny the Defendant's motion to suppress the evidence gathered at her house pursuant to a search warrant that did not conform with the technical requirements of Tennessee Rule of Criminal Procedure 41; (3) whether the trial court erred by ruling inadmissible certain expert testimony proffered by the defense during the hearing on the Defendant's motion to suppress her statement to Detective Malach; (4) whether the trial court erred by denying the Defendant's motion to suppress her statement; and (5) whether the trial court erred by prohibiting the Defendant's expert witness from testifying at trial about the reliability of her responses to Detective Malach's questions. We also directed the parties to address whether the good-faith exception to the exclusionary rule that this Court adopted in Davidson, 509 S.W.3d at 185-86, should be expanded to include clerical errors made by the magistrate issuing a search warrant when the search in question is otherwise constitutional.

---

[2] Because we are not addressing the sufficiency of the evidence in this appeal, we have kept our summation of the gruesome facts in this case very brief. The Court of Criminal Appeals' opinion in this matter contains a thorough review of the facts adduced at trial. See State v. Lowe, No. M2014-00472-CCA-R3-CD, 2016 WL 4909455, at *1-12 (Tenn. Crim. App. July 12, 2016), perm. appeal granted (Tenn. Jan. 18, 2017).

## Analysis

### *Search of Defendant's House*

Prior to trial, the Defendant moved to suppress the evidence obtained from her house pursuant to a search warrant. At the hearing on the motion to suppress, the proof established that, at approximately 9:10 a.m. on September 14, 2011, Detective David Harrell was instructed to obtain a search warrant for the Lowe residence. He prepared the necessary paperwork, including three copies of the proposed search warrant, and appeared before Judge C. J. Rogers at the Circuit Court in Sumner County. At 11:35 a.m. on September 14, 2011, Judge Rogers signed and issued the search warrant in triplicate. However, on the line providing the date and time at which the warrant was delivered to Detective Harrell for execution, Judge Rogers indicated "11:35 o'clock AM, on this 14 day of Sept, 2011" on two of the copies and "11:35 o'clock PM, on this 14 day of Sept, 2011" on the third copy. Judge Rogers testified at the hearing and described the AM/PM discrepancy as a "clerical error" on his part.[3]

After obtaining the warrant, Detective Harrell returned to the Lowe residence and executed it, beginning at approximately 12:34 p.m. on September 14, 2011. Pursuant to the warrant, he collected a laundry basket and its contents; bloody linens and clothing; a thumb drive from the Defendant's bedroom; and several computers and computer components. The police also took photographs and conducted testing for the presence of blood in the Defendant's bedroom and bathroom. When the search was finished, Detective Harrell left one of the copies of the warrant marked "AM" on the kitchen counter. The copy of the warrant bearing the "PM" notation was returned and filed with the trial court on September 21, 2011.

The Defendant contended that the evidence collected pursuant to the search warrant must be suppressed because, contrary to the requirements of Tennessee Rule of Criminal Procedure 41, the three copies of the search warrant were not exact replicas because two of them indicated that the warrant was issued in the morning, and one of them indicated that the warrant was issued in the evening.

The trial court denied the Defendant's motion to suppress the evidence recovered upon execution of the search warrant. The trial court acknowledged that the warrant did

---

[3] At the hearing, Judge Rogers requested to see "all three originals" of the search warrant. He explained that, while he was being shown "some copies," he "need[ed] the originals" because he could not "ever work off of a copy." The trial court then stated on the record, "There's the three originals," whereupon Judge Rogers testified, "The original that the officer has and my original are A.M. I don't know about this one that shows up P.M. If I wrote P.M., which I obviously did, my mistake." The State's brief, which indicates that two of the iterations of the warrant indicated "P.M.," is incorrect.

5

not comply with Tennessee Rule of Criminal Procedure 41(d) because there was a discrepancy between the three iterations of the warrant. See Tenn. R. Crim. P. 41(d) (2011) (requiring the magistrate to "prepare an original and two *exact* copies of each search warrant" (emphasis added)). The trial court also acknowledged that Rule 41 required suppression of the evidence gathered pursuant to the warrant because of the discrepancy. See Tenn. R. Crim. P. 41(g)(5)(A) (requiring trial court to grant a motion to suppress if "the magistrate did not . . . make an original and two copies of the search warrant"). Nevertheless, the trial court ruled that the evidence obtained pursuant to the warrant should not be suppressed on the basis of the ERRA, which provides as follows:

> (a) Notwithstanding any law to the contrary, any evidence that is seized as a result of executing a search warrant issued pursuant to . . . Tennessee Rules of Criminal Procedure Rule 41 that is otherwise admissible in a criminal proceeding and not in violation of the constitution of the United States or Tennessee shall not be suppressed as a result of any violation of . . . Tennessee Rules of Criminal Procedure Rule 41 if the court determines that such violation was a result of a good faith mistake or technical violation made by a law enforcement officer, court official, or the issuing magistrate as defined in subsection (c).
>
> . . . .
>
> (c) As used in this section, unless the context otherwise requires, "good faith mistake or technical violation" means:
>
> (1) An unintentional clerical error or clerical omission made by a law enforcement officer, court official or issuing magistrate in the form, preparation, issuance, filing and handling of copies, or return and inventory of a search warrant[.]

Tenn. Code Ann. § 40-6-108 (Supp. 2011).

> Relying on this statute, the trial court ruled as follows:

> I find specifically that, although there is a violation of Rule 41(d), that the magistrate did not prepare an original and two exact copies of the warrant, that this violation was the result of a good faith mistake or technical violation made by the issuing judge, that this error was an unintentional clerical error made by the issuing judge that had absolutely no effect on . . . the constitutionality of this warrant. Therefore, . . . I find that [the ERRA] applies and there is good faith here, and I uphold the validity based on this statute . . . . Therefore, the warrant will be upheld. The

6

evidence taken from the search warrant will be admitted into evidence and the motion to suppress is respectfully denied.

Before this Court, the Defendant argues "that in enacting the Exclusionary Rule Reform Act the Tennessee legislature invaded the province of the judicial branch, as prohibited by the separation of powers doctrine of the Tennessee Constitution, that no 'good faith' exception exists to salvage the defective warrants, and thus the evidence secured by the warrants should have been suppressed." The State disagrees.

## Standard of Review

Because issues of constitutional and statutory construction are questions of law, we review them de novo with no presumption of correctness accorded to the legal conclusions of the courts below. See Waters v. Farr, 291 S.W.3d 873, 882 (Tenn. 2009); State v. Walls, 62 S.W.3d 119, 121 (Tenn. 2001).

## Tennessee's Exclusionary Rule

We begin our analysis of this issue with a brief historical review. This Court first applied the exclusionary rule to evidence obtained pursuant to a defective search warrant in 1923. See Hampton v. State, 252 S.W. 1007 (Tenn. 1923). Referring to both the Tennessee Constitution's prohibition against unreasonable searches[4] and several statutes detailing the procedures to be followed in obtaining a search warrant,[5] this Court recognized that

---

[4] The Tennessee Constitution provides

[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Tenn. Const. art. 1, § 7.

[5] As quoted in Hampton, these statutes provided as follows:

7297. No search warrant can be issued but upon probable cause, supported by affidavit naming or describing the person, and particularly describing the property and place to be searched.

[t]here is no writ more calculated to be abused in its use than the search warrant, for with it any home may be entered and the inmates disturbed, humiliated, and degraded.  To prevent such a possibility from false informants made to officers inspired by overzeal, or acting from expediency, or obeying the command uttered by a mob impulse, the provisions of the Constitution and statutes found force and command observance.

. . . .

It is uniformly held that the search warrant must conform to both the constitutional and statutory requirements.

The requirements of the Constitution and the statutes we have quoted are not difficult.  It would be easy to comply with them, and compliance would result in protecting the innocent from unlawful search, and authorize the use of evidence obtained through lawful search against the guilty.

Id. at 1008 (citations omitted).

Because this Court determined that the affidavit and warrant at issue contained deficiencies that it attributed to the "carelessness" or "oversight" of the magistrate issuing the warrant, id., it held that "evidence of the offense discovered by means of the illegal search warrant was not admissible, and should have been excluded," id. at 1009.  This Court reasoned that, "'where the action of the governmental authorities is unlawful and violative of the constitutional rights of the citizen, . . . the government cannot rely upon

---

7298.  The magistrate shall, before issuing the warrant, examine on oath the complainant and any witness he may produce, and take their affidavits in writing, and cause them to be subscribed by the persons making them.

7299.  The affidavit shall set forth the facts tending to establish the grounds of the application, or probable cause for believing they exist.

7300.  If the magistrate is satisfied of the existence of the grounds of the application, or that there is probable cause to believe their existence, he shall issue a search warrant, signed by him, to any lawful officer, commanding him forthwith to search the person or place named for the property specified, and to bring it before him.

Hampton, 252 S.W. at 1008 (quoting Shannon's Code sections 7297-7300).  These statutes make no reference to the exclusion of evidence for failure to meet their requirements.

8

the evidence thus unlawfully obtained by its agents.'" Id. at 1009 (quoting Hughes v. State, 238 S.W. 588, 591 (Tenn. 1922)).

This Court has more recently described our exclusionary rule as "a judicially crafted remedy," State v. Reynolds, 504 S.W.3d 283, 314 (Tenn. 2016), whose purpose is "to deter police misconduct," id. at 312. Because the exclusionary rule originated with this Court, "this Court has both the authority and the responsibility to decide whether [a] good-faith exception, or any other exception, should be adopted." Id. at 314.

In 1959, the Tennessee General Assembly enacted a statute that both added specific requirements as to the form of warrants and incorporated implicitly an aspect of this Court's exclusionary rule:

> SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee*, That all magistrates, clerks of courts, judges and any other person or persons whomsoever issuing search warrants shall prepare an original and two exact copies of same, one of which shall be kept by him as a part of his official records, and one of which shall be left with the person or persons on whom said warrant is served. The original search warrants shall be served and returned as provided by law. The person or persons as aforesaid who issue said warrants shall endorse the warrants showing the hour, date, and the name of the officer to whom the warrants were delivered for execution, and the exact copy of such warrant and the endorsement thereon, shall be admissible in evidence in the Courts.

> SECTION 2. *Be it further enacted,* That failure to comply with Section 1 hereof shall make any search conducted under said warrant an illegal search and seizure.

1959 Tenn. Pub. Acts, ch. 241 (codified at Tenn. Code Ann. § 40-518) ("the 1959 Statute").

In 1961, this Court considered the impact of the 1959 Statute on the admissibility of evidence obtained pursuant to a search warrant described as

> contain[ing] no endorsement made on it by the justice [of the peace] "showing the hour, the date, and the name of the officer to whom the warrant was delivered for execution." Nor does it appear that the justice otherwise complied with the provisions of the statute requiring him to make two copies of the warrant, one to be kept as his official record and the other to be left with the person on whom the warrant was served.

9

Talley v. State, 345 S.W.2d 867, 869 (Tenn. 1961). Holding that the search warrant was "void" due to its failure to comply with the 1959 Statute, id., this Court reasoned:

> This statute was within the constitutional power of the Legislature, and it seems a reasonable and valid legislative declaration designed to supplement the provisions of our Constitution and of our statutes protecting citizens against unreasonable searches and seizures. Its intent no doubt was to secure the citizen against carelessness and abuse in the issuance and execution of search warrants.
>
> . . . .
>
> It appears the legislative intent was to secure strict compliance with the requirements of section 1 of the Act; for section 2 provided that failure of such compliance "shall make any search conducted under said warrant an illegal search and seizure." Words could not be plainer, and they are mandatory.

Id. (internal citations omitted). Thus, this Court construed the 1959 Statute as congruent with its decades-earlier creation and application of the exclusionary rule.

In 1979, the Tennessee General Assembly repealed the 1959 Statute because it had been replaced by a Rule of Criminal Procedure. See 1979 Tenn. Pub. Acts, ch. 399 (noting that "the Tennessee Supreme Court, after lengthy study by the court-appointed Rules Commission, adopted certain rules, known as the Tennessee Rules of Criminal Procedure, in order to modernize and clarify procedures in criminal cases and to provide for the fair and efficient conduct of such proceedings"). The Rule of Criminal Procedure that took the place of the 1959 Statute was Rule 41. See, e.g., State v. Coffee, 54 S.W.3d 231, 233 n.1 (Tenn. 2001) (noting that, "[w]hen Talley was decided, the requirements now found in Rule 41(c) were codified at Tenn. Code Ann. § 40-518 (1959)"); State v. Steele, 894 S.W.2d 318, 319 (Tenn. Crim. App. 1994) (noting that the provisions of Tennessee Rule of Criminal Procedure 41 derived from the 1959 Statute); State v. Lindsey, 1985 WL 3715, at *1-2 (Tenn. Crim. App. Nov. 20, 1985) (after reciting the text of Tennessee Rule of Criminal Procedure 41(c) with regard to a search warrant issued in 1984, noting that the tenets of the 1959 Statute were "essentially the same as Tenn. R. Crim. P. 41(c)"), perm. appeal denied (Tenn. Mar. 3, 1986). The original Rule 41 provided, in relevant part, as follows:

> (c) **Issuance [of Search Warrant]; Contents; Copies; Failure to Comply.** . . . *The magistrate shall prepare an original and two exact copies of the search warrant,* one of which shall be kept by him as a part of his official records, and one of which shall be left with [the] person or persons on whom the search warrant is served. *The magistrate shall endorse upon*

*the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution*; and the exact copy of the search warrant and the endorsement thereon shall be admissible evidence. *Failure of the magistrate to make said original and two copies of the search warrant or failure to endorse thereon the date and time of issuance* and the name of the officer to whom issued, or the failure of the serving officer where possible to leave a copy with the person or persons on whom the search warrant is being served, *shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure*.

. . . .

(f) **Motion for Return or Suppression of Property.** A person aggrieved by an unlawful or invalid search or seizure may move the court pursuant to Rule 12(b) to suppress any evidence obtained in such unlawful search or seizure. If property was unlawfully seized, he may move for the return of the property; and the motion *shall* be granted, except as to the return of contraband, if the evidence in support of the motion shows that:

. . . .

　　　(2) a search warrant was relied upon, but the search warrant or supporting affidavit is legally insufficient on its face and hence invalid[.]

Tenn. R. Crim. P. 41 (1978) (emphases added).[6]

Since the adoption of Rule 41, this Court has strictly construed the Rule's provisions consistently with its 1961 holding in <u>Talley</u>. For instance, in <u>Coffee</u>, the defendant sought to suppress evidence on the basis that the judicial commissioner who had issued the search warrant "'failed to keep an exact copy of the original of said search warrant as part of his official records as required by Rule 41(c).'" 54 S.W.3d at 232 (quoting defendant's motion to suppress). Characterizing the provision at issue as one of the "specific procedural safeguards" set forth in Rule 41, this Court held as follows:

　　　These procedural safeguards are intended "to secure the citizen against carelessness and abuse in the issuance and execution of search warrants." <u>Talley v. State</u>, 208 Tenn. 275, 345 S.W.2d 867, 869 (1961). . . .

---

[6] Effective July 1, 2018, Rule 41 has been amended in order to provide trial courts the discretion to determine whether to exclude evidence that was gathered pursuant to a search warrant that meets constitutional requirements but is noncompliant with Rule 41's technical requirements. <u>See</u> 2018 Tenn. Ct. Order 0002, No. ADM2017-01892 (Tenn. 2018).

The provision at issue, that a magistrate prepare and retain a copy of the search warrant, endeavors to prevent improper searches and facilitate judicial review of whether a search was executed within the scope of the warrant. The rule achieves its goals in that a written record of the specifics of the search stifles the ever-present temptation for an officer to conduct a search and justify it later. Additionally, the copy of the warrant enables review of the original boundaries of a search; without an exact copy of the warrant, review is compromised because the critical facts and details of the warrant cannot be precisely determined. It is for these reasons that it is important to retain an exact copy of the warrant identifying the property or person to be searched, and it is for these same reasons that this requirement has been strictly enforced by our courts for many years. See Talley, 345 S.W.2d at 868; State v. Brewer, 989 S.W.2d 349, 353-54 (Tenn. Crim. App. 1997); State v. Steele, 894 S.W.2d 318, 319 (Tenn. Crim. App. 1994).

As stated in Talley, "'Words could not be plainer, and [the procedural safeguards against abuse] are mandatory.'" 345 S.W.2d at 869 (citation omitted). Accordingly, the judicial commissioner's failure to make and retain a copy of the search warrant so that a record of the precise limits of the search could be maintained requires suppression of the evidence seized.

Coffee, 54 S.W.3d at 233-34 (footnotes omitted) (brackets in Coffee).

Similarly, in State v. Bobadilla, this Court considered the efficacy of a search warrant that "did not contain an endorsement of the hour of its issuance, as required by Rule 41(c)." 181 S.W.3d 641, 645 (Tenn. 2005). This Court held that, "[b]ecause the hour was not endorsed by the magistrate on the search warrant in this case, the warrant fails to explicitly show that it was issued first—then executed. Therefore, the search warrant fails to meet the requirements as set forth in Tennessee Rule of Criminal Procedure 41(c)." Id. Accordingly, this Court concluded that "the search warrant on its face did not meet the requirements of Tennessee Rule of Criminal Procedure 41(c). Therefore, the warrant was invalid, the search was illegal, and the evidence obtained thereby inadmissible." Id.

At the time the search warrant in this case was issued, Tennessee Rule of Criminal Procedure 41(c) provided, in pertinent part, as follows:

(1)     Issuance. — A warrant shall issue only on an affidavit or affidavits that are sworn before the magistrate and establish the grounds for issuing the warrant.

12

(2)     Content. — If the magistrate is satisfied that there is probable cause to believe that grounds for the application exist, the magistrate shall issue a warrant as follows:

(A)     The warrant shall, as the case may be, identify the property or place to be searched, or name or describe the person to be searched; the warrant also shall name or describe the property or person to be seized.

(B)     The search warrant shall command the law enforcement officer to search promptly the person or place named and to seize the specified property or person.

(C)     The search warrant shall be directed to and served by:

(i)  the sheriff or any deputy sheriff of the county where the warrant is issued; or

(ii)  any constable or any other law enforcement officer with authority in the county.

(D)     *The magistrate shall endorse on the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution.*

Tenn. R. Crim. P. 41(c) (2011) (emphasis added).  Additionally, subsection (d) of Rule 41 provided that "[t]he magistrate shall prepare an original and two *exact* copies of each search warrant.  The magistrate shall keep one copy as a part of his or her official records.  The other copy shall be left with the person or persons on whom the search warrant is served."  Tenn. R. Crim. P. 41(d) (emphasis added).  Further, Rule 41 provided that a motion to suppress evidence obtained pursuant to a search warrant "shall be granted" if "the magistrate did not . . . make an original and two copies of the search warrant."  Tenn. R. Crim. P. 41(g)(5)(A).

In State v. Hayes, 337 S.W.3d 235 (Tenn. Crim. App. 2010), our Court of Criminal Appeals considered a search warrant that suffered from the same irregularity that is present in the instant case.  The detective who prepared the warrant made two copies and presented all three documents to the trial judge.  Id. at 251-52.  The judge signed and dated all three documents.  Id.  One of the copies indicated that it was issued on September 12, 2005, at 10:35 a.m.; the original and remaining copy indicated that the warrant was issued on September 12, 2005, at 10:35 p.m.  Id. at 252.  The warrant was executed during the early afternoon of September 12, 2005.  Id.  Proof at the suppression hearing established that the judge had actually issued the warrant in the morning and had

13

committed a clerical error when he indicated "p.m." on two of the copies of the warrant. Id.

Relying on this Court's rulings in Coffee and Bobadilla, our intermediate appellate court reasoned that, "[l]ogically, in order to ensure that the warrant is first issued, *then* executed, not only must the time be endorsed, but the *accurate* time must be endorsed." Id. at 254. "Accordingly," the Court of Criminal Appeals held, "the requirement that the date and time of issuance shall be endorsed implicitly means that the *correct* date and time shall be endorsed. Thus, the search warrant in this case failed to comply with the requirements of Rule 41 and the motion to suppress must be granted." Id. at 256.

Following these decisions, the General Assembly promulgated the ERRA in 2011. There is no dispute that the ERRA was in effect at the time the subject search warrant was issued. As set forth above, the ERRA dictates that certain evidence otherwise subject to Tennessee's exclusionary rule "shall not be suppressed." Tenn. Code Ann. § 40-6-108(a). Because the ERRA specifically conflicts with this Court's holdings regarding our exclusionary rule, as well as with the express language of a procedural rule promulgated by this Court, we turn now to an examination of whether this statute unconstitutionally violates the Separation of Powers Clause of the Tennessee Constitution.

Separation of Powers

Article II, section 1 of the Tennessee Constitution provides that "The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial." Section 2 of the same Article provides: "Limitation of powers. No person or persons belonging to one of these departments [set forth] shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." With respect to the judicial department, the Tennessee Constitution specifies that "the judicial power of this State shall be vested in one Supreme Court and in such Circuit, Chancery and other inferior Courts as the Legislature shall from time to time, ordain and establish; in the Judges thereof, and in Justices of the Peace." Tenn. Const. art. VI, § 1. The Tennessee Supreme Court is a "direct creature of the Constitution" and "constitutes the supreme judicial tribunal of the [S]tate." Barger v. Brock, 535 S.W.2d 337, 340 (Tenn. 1976). The Tennessee Supreme Court "and its jurisdiction cannot be interfered with by the other branches of the government. *Its adjudications are final and conclusive upon all questions determined by it*, save those reserved to the federal courts, which may be reviewed by the Supreme Court of the United States." Clements v. Roberts, 231 S.W. 902, 902 (Tenn. 1921) (emphasis added) (citing Miller v. Conlee, 37 Tenn. 432, 433 (1858); Dodds v. Duncan, 80 Tenn. 731, 734 (1884); State, to Use of Fletcher v. Gannaway, 84 Tenn. 124, 126 (1885)).

14

This Court has recognized that it, and it alone, "has the inherent power to promulgate rules governing the practice and procedure of the courts of this state," State v. Mallard, 40 S.W.3d 473, 480-81 (Tenn. 2001), and that "this inherent power 'exists by virtue of the establishment of a Court and not by largess of the legislature,'" id. at 481 (quoting Haynes v. McKenzie Mem'l Hosp., 667 S.W.2d 497, 498 (Tenn. Ct. App. 1984)). Moreover,

> because the power to control the practice and procedure of the courts is inherent in the judiciary and necessary "to engage in the complete performance of the judicial function," this power cannot be constitutionally exercised by any other branch of government. In this area, "[t]he court is supreme in fact as well as in name."

Id. (quoting Anderson Cnty. Q. Ct. v. JJ. of 28th Jud. Cir., 579 S.W.2d 875, 877 (Tenn. Ct. App. 1978); Barger, 535 S.W.2d at 341) (citations omitted).

We continued in Mallard:

> Notwithstanding the constitutional limits of legislative power in this regard, the courts of this state have, from time to time, consented to the application of procedural or evidentiary rules promulgated by the legislature. Indeed, such occasional acquiescence can be expected in the natural course of events, as this practice is sometimes necessary to foster a workable model of government. When legislative enactments (1) are reasonable and workable *within the framework already adopted by the judiciary*, and (2) work to *supplement* the rules already promulgated by the Supreme Court, then considerations of comity amongst the coequal branches of government counsel that the courts not turn a blind eye. . . .

> It must be emphasized, however, that the consent of the courts to legislative regulation of inherent judicial authority is purely out of considerations of inter-branch comity and is not required by any principle of free government. To hold otherwise would be to irreparably damage the division of governmental power so essential to the proper maintenance of our constitutional republic. As the Court of Appeals has stated,

>> In deference to separation of powers, judges will lean over backward to avoid encroaching on the legislative branch's (power) . . . .

>> . . . .

15

However, the separation of powers doctrine, properly understood, imposes on the judicial branch not merely a Negative duty not to interfere with the executive or legislative branches, but a Positive responsibility to perform its own job efficiently. This Positive aspect of separation of powers imposes on courts affirmative obligations to assert and fully exercise their powers, to operate efficiently by modern standards, to protect their independent status, and to fend off legislative or executive attempts to encroach upon judicial [prerogatives].

Id. at 481-82 (emphasis added) (quoting Anderson Cnty. Q. Ct., 579 S.W.2d at 878).

Thus, we recognized that "'[i]t is an imperative duty of the judicial department of government to protect its jurisdiction at the boundaries of power fixed by the Constitution,'" id. at 482 (quoting State ex rel. Shepherd v. Nebraska Equal Opportunity Comm'n, 557 N.W.2d 684, 693 (Neb. 1997)), and that "the legislature can have no constitutional authority to enact rules, either of evidence or otherwise, that strike at the very heart of a court's exercise of judicial power," id. at 483 (citation omitted).

The State argues in its brief to this Court that the ERRA "can be read to supplement Rule 41(g) without frustrating or impairing its overriding function." We disagree. The ERRA is not an attempt by the General Assembly to "supplement" Rule 41; the ERRA is an attempt by the General Assembly to *abrogate* both the express terms of Rule 41 and this Court's prior holdings regarding Rule 41. Cf. State v. Pruitt, 510 S.W.3d 398, 417 (Tenn. 2016) (characterizing the ERRA as "a modification of a rule of criminal procedure"). By passing the ERRA, the General Assembly was attempting to create a good-faith exception to the exclusionary rule, a *judicially created remedy*. We repeat: "this Court has both the authority and the responsibility to decide whether [a] good-faith exception, or any other exception [to the exclusionary rule], should be adopted." Reynolds, 504 S.W.3d at 314 (citing Hodge v. Craig, 382 S.W.3d 325, 337 (Tenn. 2012)). We are compelled to conclude that, by passing the ERRA, the General Assembly effectively usurped both that authority and that responsibility.

We hold that, by directly contradicting existing procedural rules and then-existing Court precedent related to any good-faith exception through the enactment of the ERRA, the General Assembly overstepped its constitutional boundaries. The ERRA represents a violation of the Tennessee Constitution's Separation of Powers Clause and, therefore, cannot be upheld.

In light of our holding that the ERRA is unconstitutional, we must conclude that the trial court erred when it denied the Defendant's motion to suppress in reliance on the ERRA. However, that conclusion does not necessarily entitle the Defendant to relief.

16

<u>Good-Faith Exception to Rule 41's Exclusionary Rule</u>

This Court recently adopted a good-faith exception to the exclusionary rule in a case in which the record demonstrated that a law enforcement officer executed a warrant in good faith but the warrant later was determined to be invalid "solely because of a good-faith failure to comply with the affidavit requirement of Tennessee Code Annotated section 40-6-103 and -104 and Tennessee Rule of Criminal Procedure 41(c)(1)." <u>Davidson</u>, 509 S.W.3d at 186.[7]  In doing so, we noted that the search warrant complied with the United States and Tennessee Constitutions because it was issued by a neutral and detached magistrate, specifically described the place to be searched and the things to be seized, and it was based on probable cause supported by testimony under oath.  <u>Id.</u> at 183.

We then considered the defect that rendered the warrant noncompliant with the relevant statutes and Rule 41:  the preparing officer inadvertently printed out the supporting affidavit on letter-sized paper instead of legal-sized paper with the result being that the signature line was left off of the affidavit.  As a result, after appearing before the magistrate and swearing to the truth of the affidavit, the officer did not sign the affidavit as the affiant.  Both the issuing magistrate and the officer did sign the warrant, however.  We summarized the status of the warrant as follows:  "Because Investigator Childress inadvertently failed to sign as the affiant on the affidavit, the search warrant was not issued on the basis of a signed affidavit as required by Tennessee Code Annotated section 40-6-103 and 40-6-104 and Tennessee Rule of Criminal Procedure 41(c)(1).  All other constitutional and statutory requirements were met."  <u>Id.</u> at 184.

We adopted the good-faith exception referenced above based on the following reasoning:

> Investigator Childress intended to obtain a valid search warrant.  He reasonably believed that the warrant, based on probable cause and issued by a neutral and detached magistrate, was valid.  The search warrant was later determined to be invalid based on noncompliance with statutory and procedural provisions because Investigator Childress printed the affidavit on the wrong size paper, did not notice that the signature line was cut off, and failed to sign the affidavit.  Instead, he placed his signature on a line on the warrant.  All other constitutional and statutory requirements were met. . . .  When an officer has complied with constitutional requirements to obtain a warrant, but in good faith failed to comply with the state statutory and rule affidavit requirements, societal interests are not advanced when the

---

[7] We note that the search warrant at issue in <u>Davidson</u> was issued in January 2007, before the ERRA became effective.  <u>See</u> <u>Davidson</u>, 509 S.W.3d at 173.

17

exclusionary rule applies to exclude evidence obtained from execution of the warrant.

Id. at 186.

A similar analysis is called for under the facts of this case. Here, the good-faith mistake was made not by the officer seeking the warrant but by the judge when he filled out the requisite information about the time of issuance. Judge Rogers completed the search warrant paperwork in triplicate, as mandated by Rule 41, but erroneously indicated the hour as "PM" on one of the three required iterations. Judge Rogers correctly indicated "AM" on the other two. Because the search was conducted immediately after the warrant was issued, i.e., long before "11:35 PM," and because a signed copy of the warrant was left at the Lowe residence, it was obvious to all concerned that the mistake was a simple clerical error. Indeed, Judge Rogers himself testified that the "PM" was the result of a clerical error on his part.

As this Court has emphasized repeatedly, the purpose of the magistrate indicating the time at which a search warrant is issued is to ensure that the warrant is obtained *before* the search is conducted, not afterwards. See, e.g., Bobadilla, 181 S.W.3d at 645; Coffee, 54 S.W.3d at 233. Moreover, Rule 41's requirement that all three copies of a search warrant be "exact" is to ensure that "the critical facts and details of the warrant" are subject to precise determination. Coffee, 54 S.W.3d at 233. To this end, we remind officers and magistrates that their utmost attention to detail is required when seeking and issuing search warrants. See Everett v. State, 184 S.W.2d 43, 45 (Tenn. 1944) ("The use of printed forms has made the procurement of a search warrant the merest formality, considering the fundamental constitutional right which the search invades. Certainly, this Court can do no less than to require that the few blank spaces be filled in, and the other details of the formality be carried out with care and precision."). Nevertheless, we also recognize that officers and magistrates are busy human beings and, as such, can be expected to make the occasional harmless clerical error in good faith.

There is no contention in this case that the search of the Lowe residence took place before the search warrant was duly issued. Nor is there any contention that the "AM/PM" discrepancy resulted in any particular prejudice to the Defendant. Rather, the Defendant contends that all of the evidence gathered pursuant to a search warrant that satisfied constitutional requirements must be suppressed because Rule 41's technical requirement of three "exact" copies was not met. However, the facts of this case support the trial court's findings that the technical violation of Rule 41 "was the result of a good faith mistake" and "was an unintentional clerical error" by the issuing magistrate. The record further demonstrates that the variation between the three copies of the warrant caused by the magistrate's good-faith mistake was inconsequential. We hold that the exclusionary rule should not be applied under these circumstances.

18

We hold that a good-faith clerical error that results in an inconsequential variation between the three copies of a search warrant required pursuant to Rule 41, in and of itself, does not entitle the moving party to suppression of the evidence collected pursuant to the warrant. We adopt a good-faith exception to the exclusionary rule under such circumstances. When a magistrate has issued a warrant in compliance with constitutional requirements but, in good faith, fails to comply with Rule 41's technical requirement of three "exact" copies, "societal interests are not advanced when the exclusionary rule applies to exclude evidence obtained from execution of the warrant." Davis, 509 S.W.3d at 186.

In order to provide guidance to trial courts considering motions to suppress arising from technical violations of Rule 41, we take this opportunity to explain that, when a defendant has demonstrated that a search warrant or its supporting affidavit is noncompliant with the technical requirements of Rule 41 or other relevant statute(s), the burden shifts to the State to establish by a preponderance of the evidence that (1) the technical noncompliance was the result of a good-faith error and (2) the error did not result in any prejudice to the defendant. See, e.g., United States v. Diehl, 276 F.3d 32, 41-42 (1st Cir. 2002) (recognizing that, where the state is defending a motion to suppress on the basis of a good-faith exception to the exclusionary rule, it is the state's burden to demonstrate that the conduct at issue meets the standards of good faith). Although the term "good faith" is not subject to precise definition, a good-faith mistake is one characterized by simple, isolated oversight or inadvertence. A good-faith mistake does not include conduct that is deliberate, reckless, or grossly negligent, nor does it include multiple careless errors. Furthermore, where a finding of good faith depends on the credibility of one or more witnesses, the trial court should set forth its assessment of that factor to facilitate appellate review. If the State carries its burden of proving both prongs, the trial court then may consider, in the trial court's sound discretion, whether the technical noncompliance was sufficiently inadvertent and inconsequential to qualify for the narrow good-faith exception to Rule 41's exclusionary rule that we have adopted.[8]

In sum, we affirm, although on different grounds, the trial court's denial of the Defendant's motion to suppress the evidence gathered from the Lowe residence.

*Defendant's Statement to Detective Malach*

In addition to moving to suppress the evidence gathered from her home, the Defendant moved to suppress the statement she made to Detective Malach on the basis that Detective Malach failed to advise her properly of her rights as required under

---

[8] Because the trial court in this case did not have the benefit of the good-faith exception analysis that we adopt herein, the trial court did not make a specific finding that the error at issue was inconsequential and caused no prejudice to the Defendant. However, the record contains no indication that the "A.M./P.M." variance was anything other than inconsequential and harmless.

<u>Miranda</u> and that her alleged waiver of those rights was ineffective.  The Defendant also asserted that her statement was not voluntary due to Detective Malach's interrogation technique and her mental status at the time she made her statement.

At the November 2012 hearing on the Defendant's motion, Detective Malach testified that, when he arrived at the dental practice where the Defendant worked, he spoke to a manager and asked to speak to the Defendant.  Detective Malach was led to the Defendant's workstation where the Defendant was working.  Detective Malach introduced himself and requested a private space.  Detective Malach and the Defendant went to a meeting room and Detective Malach began their conversation by asking if the Defendant knew why he was there.  He testified, "She was in a good mood.  She was laughing.  She said no."  Detective Malach told her that they "had found the laundry basket" and, according to Detective Malach, "[a]t that point [the Defendant's] mood changed," and "she became more serious about it."

Detective Malach explained that he wanted the Defendant's cooperation in determining what had happened and that he wanted her to come to the police department for an interview.  He also told her that, once they got to the police department, he would issue her <u>Miranda</u> warnings.  He testified that he "went over" the <u>Miranda</u> warnings at the dental office.  He told the Defendant that she did not have to go to the police department and that she did not have to speak with him.  When he asked her if she would come to the police department to be interviewed, the Defendant agreed to do so.  She also agreed to accompany Detective Malach in his vehicle, and she rode in the front passenger seat.  She was not handcuffed.  During the drive, they did not discuss any matters involving the dead infant boy.  Detective Malach described their conversation during the drive as "normal" and described the Defendant's mood and demeanor as, "She was nice.  She was laughing, you know, talking, just a normal conversation.  There wasn't a whole range of emotions."

After they arrived at the police station, Detective Malach took the Defendant into an interview room.  The ensuing interview was videotaped.  Detective Malach testified that he read the Defendant her <u>Miranda</u> rights, and she orally waived them.  When the Defendant asked if she should have an attorney, Detective Malach "let her know it was not mandatory."  The Defendant subsequently agreed to the interview.

On cross-examination, Detective Malach acknowledged that he did not obtain a written waiver of her <u>Miranda</u> rights from the Defendant.  He explained his position was that, given the videotape of the interview, the written waiver was not necessary.  Detective Malach also testified that he had received some "first responder" first aid training.  Based on this training, he suspected that the Defendant had recently given birth and "assumed" that she had lost a significant amount of blood.  He agreed that "extreme blood loss can impair somebody's ability to think and reason."

20

Detective Malach described the interview room as being "a little bit on the interior of the building," requiring passage through several doors and not open to the general public. The room had no windows.

In response to questions by the trial court, Detective Malach testified that he did not consider the Defendant to have been in custody "until we found out exactly what happened during the interview." He indicated that, once the interview had provided probable cause to arrest the Defendant, she would not have been free to leave the police station.

The videotape of the interview was admitted into evidence, and the trial judge stated that he had reviewed it. This Court has reviewed it as well.

After Detective Malach finished testifying for the State, the defense called Dr. Pamela Auble, a psychologist who had examined the Defendant after she was arrested. The State objected on the basis of relevancy. Defense counsel explained that Dr. Auble would testify "as to [the Defendant's] mental state at the time that she was—or near the time she was being interrogated." Defense counsel told the trial court that Dr. Auble had not reviewed the videotape of the Defendant's statement but had administered several psychological tests and, based on the results of those tests, would testify about the Defendant's "ability to perform in an interview at the time Detective Malach talked to her." Defense counsel asserted that Dr. Auble had concluded that the Defendant's thinking and reasoning had been impaired at the time Dr. Auble saw the Defendant, which was several days after the police interview. Defense counsel further asserted that Dr. Auble could opine as to the effect of those several days on the Defendant's mental state. Defense counsel stated,

> Judge, I expect Dr. Auble to be able to say that [the Defendant] was someone who could be—who would have a difficult time understanding the adversarial nature of the interview; that she was someone with extremely low self-esteem, as I mentioned the depression and anxiety; and she was someone who in response to authority, such as a police officer, would almost not have a will to say no.

The trial court understood the defense to be arguing that Dr. Auble's testimony would be relevant to demonstrating that the Defendant's alleged waiver of her Miranda rights was not effective and that her ensuing statement was not voluntary. The trial judge allowed Dr. Auble to be sworn in so that he could "ask some basic questions" "just to preserve the record." When Dr. Auble told the trial court that she had not watched the videotape of the Defendant's interview with Detective Malach, the trial judge stated, "I'm not going to allow her testimony." After further argument by defense counsel, the trial court clarified that it was ruling Dr. Auble's testimony inadmissible for two reasons: first, because of the time delay between the interview and Dr. Auble's testing, which

21

delay encompassed the Defendant being arrested, placed in jail, and medicated; and second, because Dr. Auble had not reviewed the videotape of the Defendant's statement. The trial court allowed the defense to place a copy of Dr. Auble's report in the record, under seal, as an offer of proof.

The defense next called Dr. William Kenner, a psychiatrist who had treated the Defendant after she was arrested on the instant charges. Dr. Kenner testified that he first saw the Defendant on October 21, 2011, and that he had seen her eight to ten times since then. He diagnosed the Defendant as suffering from posttraumatic stress disorder; dissociative disorder not otherwise specified; and adjustment disorder with anxiety and depression. Dr. Kenner stated that he had watched the videotape of the Defendant's interview with Detective Malach.

When the trial court asked Dr. Kenner if, at the time of her interview with Detective Malach, the Defendant had been "capable of understanding and waiving her constitutional rights," Dr. Kenner responded,

> There are two aspects to that question. One is a cognitive understanding, could she understand the words that were said to her, and from a strictly cognitive standpoint, she can. There's also an emotional aspect of understanding, with which she would struggle. [The Defendant] is an extremely passive individual. She was before she became pregnant, and that was part of what happened that she became pregnant. She— because of her difficulty in standing up for herself, she is extraordinarily vulnerable to simply complying with an interrogator's version of reality rather than sticking up for her own.

Dr. Kenner added that, due to the unassisted deliveries during which the Defendant lost a significant amount of blood, the Defendant was "a woman who was not in good shape physically at the time of the interrogation."

Asked by defense counsel about his opinion of the Defendant's ability to waive her Miranda rights after having viewed the videotape, Dr. Kenner opined, "As I said earlier, I think from a cognitive standpoint, if you ask her to—or if you explained her rights to her, she would be able to hear those, but her ability to stand up for herself and to understand that she could put those rights into play, she's going to be—have almost no ability in that department." Dr. Kenner added,

> I think the interrogation was highly coercive. It involved considerable bullying on the part of Detective Malach, and when you—he essentially had his narrative of what had occurred, and, in essence, asked her to agree with him. Her ability not to agree, even though she may have other—wish

not to or have other ideas about it, is not that great. She's a highly compliant young woman.

On cross-examination, Dr. Kenner clarified that he did not consider Detective Malach's demeanor during the interview to have been bullying, but rather "his words were emotionally powerful and bullying." He added, "this is a woman who was having a great deal of trouble thinking, thinking clearly, and at the time of her interrogation what I think she was pushed into agreeing to was an element of knowingly killing the babies." Dr. Kenner opined that, at the time of the births, the Defendant was not "capable of knowing that the simple act of putting your hand over the mouth would suffocate a baby."

Neither the State nor the defense called any additional witnesses. After hearing argument, the trial court denied the Defendant's motion to suppress her statement. The trial court found that the Defendant "was clearly physically and mentally able to engage and carry out the questioning and conversation with Detective Malach," that she "was voluntarily engaged in conversation," and "[t]here was no significant mental or physical issue to make this statement involuntary." The trial court concluded that the Defendant's

> statements were not the result of techniques and methods offensive to due process. There was no interference with the defendant's free will in giving any incriminating statements in this interview. Further, her free will was definitely not overborne in such a way as to render her statements a product of force, coercion or intimidation.

The trial court also determined that, in light of the videotape and Dr. Kenner's testimony, the Defendant "might have some emotional issues but that did not make her incapable of understanding her waiver and the constitutional rights admonition." The trial court added, "I conclude that this statement was not the result of unconstitutional force, coercion, [or] manipulation tactics in violation of the due process clause of the United States Constitution or the Tennessee Constitution."

The trial court further determined that, prior to and at the beginning of the interview, the Defendant was not in custody for purposes of <u>Miranda</u>; that, nevertheless, the Defendant was properly advised of her rights pursuant to <u>Miranda</u>; and that the Defendant made an ambiguous request for an attorney that Detective Malach dealt with appropriately, followed by the Defendant's agreement to continue the interview without an attorney. Accordingly, the trial court ruled that the Defendant's statement was not made in contravention of either the federal or state constitutions.

Before this Court, the Defendant argues that the trial court erred in excluding Dr. Auble's testimony. She also contends that she (1) was in custody during her

interrogation by Detective Malach; (2) "was denied her <u>Miranda</u> rights prior to her interrogation"; and (3) "did not effectively waive her <u>Miranda</u> rights."

Exclusion of Dr. Auble's Testimony

The Defendant contends that the trial court committed reversible error by refusing to admit the testimony of Dr. Auble regarding the voluntariness of the Defendant's statement. The Defendant also asserts that the trial court erred by not permitting the defense to make an offer of proof by question and answer, citing Tennessee Rule of Evidence 103(b).

Addressing this second contention first, we agree with the Defendant that the trial court erred by not allowing defense counsel to make its offer of proof through soliciting testimony from Dr. Auble in question and answer form. Tennessee Rule of Evidence 103(b) provides that a trial court "shall permit the making of an offer [of proof] in question and answer form." This Court has recognized that the question and answer format is "the better practice," <u>see</u> <u>Farmers-Peoples Bank v. Clemmer</u>, 519 S.W.2d 801, 804 (Tenn. 1975), and our Court of Criminal Appeals has properly held that "the trial court must allow [question and answer offers] when appropriately offered," <u>Alley v. State</u>, 882 S.W.2d 810, 817 (Tenn. Crim. App. 1994) (citing N. Cohen, D. Paine, S. Sheppeard, <u>Tennessee Law of Evidence</u> § 103.4 at 16 (2d ed. 1990)).

The purpose of an offer of proof is to preserve excluded evidence in a manner sufficient to allow appellate review of the trial court's decision to exclude the evidence. As this Court previously has recognized,

> In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner. When it is a document or exhibit, this is done simply by having the exhibit marked for identification only and not otherwise introduced. When, however, it consists of oral testimony, it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible.

<u>State v. Goad</u>, 707 S.W.2d 846, 852-53 (Tenn. 1986); <u>see also</u> <u>Alley</u>, 882 S.W.2d at 816 ("When a party contends that the trial court erred in excluding testimony, the need for a description of that testimony is compelling. Absent such a showing, an appellate court cannot determine whether the exclusion was error, and if error is found, whether the error is harmless."). Thus, if the record on appellate review is sufficient to allow the reviewing court to determine whether the trial court erred in excluding the proffered evidence, the trial court's erroneous refusal to allow the evidence to be proffered via questions and answers will not entitle the proffering party to relief. <u>See</u> Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set

24

aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

In this case, defense counsel stated on the record that Dr. Auble had administered three psychological tests to the Defendant on September 23, 2011, and that Dr. Auble would testify about the Defendant's "ability to perform in an interview at the time Detective Malach talked to her." Defense counsel added,

> I expect Dr. Auble to be able to say that [the Defendant] was someone who could be—who would have a difficult time understanding the adversarial nature of the interview; that she was someone with extremely low self-esteem, as I mentioned the depression and anxiety; and she was someone who in response to authority, such as a police officer, would almost not have a will to say no.

Additionally, while the trial court did not allow defense counsel to question Dr. Auble about her evaluation of the Defendant, the trial court admitted, under seal, Dr. Auble's written report as an exhibit to the hearing. The record reflects that the trial court reviewed the report prior to ruling that Dr. Auble's testimony was inadmissible. Dr. Auble's report contains the following "conclusion":

> In summary, the personality testing revealed acute distress with symptoms of both severe depression and anxiety. [The Defendant's] thinking and reasoning were impaired at the time that I saw her. She had poor self-esteem and a tendency to respond to situations on the basis of feelings rather than thinking. There were health concerns from the testing. She is introverted and passive, with difficulty being assertive about her needs.

We hold that, although the trial court should have permitted defense counsel to proffer Dr. Auble's testimony via questions and answers, the trial court's error in this regard was harmless. The record contains a sufficient summation of Dr. Auble's expected testimony to enable this Court to determine whether the trial court erred by excluding it. Accordingly, the Defendant is not entitled to relief on the basis of the trial court's refusal to allow the defense to proffer Dr. Auble's expected testimony via a question and answer format.

We turn, then, to an assessment of whether the trial court erred by excluding Dr. Auble's testimony at the hearing on the Defendant's motion to suppress her statement to Detective Malach. As set forth above, the excluded testimony would have been offered to prove that the Defendant's statement to Detective Malach was not voluntary. It is

25

axiomatic that the State may not prove its case-in-chief against a criminal defendant by using an involuntary statement. See, e.g., Oregon v. Elsted, 470 U.S. 298, 306-07 (1985).

The trial court ruled Dr. Auble's testimony inadmissible for two reasons. First, the trial court recognized that, by the time Dr. Auble evaluated the Defendant, the Defendant had been arrested, jailed, and charged with two counts of first degree murder. Due to these significant intervening negative events, the trial court reasoned, Dr. Auble's conclusions about the Defendant's state of mind at the time of her earlier interview with Detective Malach were not reliable. Second, the trial court reasoned that Dr. Auble's conclusions about the Defendant's interactions with Detective Malach were not sufficiently reliable because Dr. Auble had not watched the videotaped interview.

This Court reviews a trial court's decision regarding the admissibility of expert testimony for an abuse of discretion. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993) (stating that, "[i]n Tennessee the qualifications, admissibility, relevancy and competency of expert testimony are matters which largely rest within the sound discretion of the trial court"). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the proof, or utilizes reasoning that causes an injustice to the complaining party. Konvalinka v. Chattanooga-Hamilton Cnty Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008).

Tennessee Rule of Evidence 702 provides that, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." However, Tennessee Rule of Evidence 703 provides, in pertinent part, that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Although the trial court did not specifically reference Rule 703 in its ruling that Dr. Auble's testimony was inadmissible, the trial court's stated reasons for disallowing that proof indicate clearly that the trial court considered her opinion unreliable for two reasons: first, because the underlying data was compromised by the passage of time and the significant events that had occurred during that time, and second, because Dr. Auble had not watched the very interview about which she was expected to opine. That is, the trial court considered the underlying data upon which Dr. Auble was basing her opinion to be both (1) influenced by subsequent events and (2) incomplete.

We hold that the trial court did not err in ruling Dr. Auble's testimony inadmissible. We agree with the trial court that Dr. Auble's proffered opinion was based on facts that indicated a lack of trustworthiness as to the issue for which her opinion was being proffered and that, further, because she had not reviewed the interview between the Defendant and Detective Malach, her proffered opinion was based on incomplete data.

26

Therefore, it would not have substantially assisted the trial court to determine whether the Defendant's statement to Detective Malach was voluntary. See State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994) (holding that trial court did not erroneously exclude expert's opinion regarding defendant's susceptibility to coercion because expert reviewed only a portion of interrogation, rendering expert's opinion "not sufficiently trustworthy"). The Defendant is entitled to no relief on this issue.

<u>The Defendant's *Miranda* Rights</u>

We now consider the Defendant's assertions that her statement to Detective Malach should have been suppressed because of <u>Miranda</u> violations.

When this Court reviews a trial court's denial of a defendant's motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996). We are bound by the trial court's findings of fact unless the evidence in the record preponderates against them. <u>Id.</u> Moreover, because the State prevailed in the trial court, it "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." <u>Id.</u> We review the trial court's application of the law to the facts de novo, however, with no presumption of correctness. <u>State v. Talley</u>, 307 S.W.3d 723, 729 (Tenn. 2010) (citing <u>State v. Walton</u>, 41 S.W.3d 75, 81 (Tenn. 2001)).

In <u>Miranda v. Arizona</u>, the United States Supreme Court held as follows:

[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized . . . . [Accordingly,] [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

384 U.S. 436, 478-79 (1966). We have recognized that, "[b]y its own terms, <u>Miranda</u> applies to the questioning of an individual who has been 'taken into custody or otherwise

27

deprived of his freedom by the authorities in any significant way.'" State v. Dailey, 273 S.W.3d 94, 102 (Tenn. 2009).[9]

Thus, our first inquiry is whether the Defendant was "in custody" during her interview with Detective Malach. This Court concluded over twenty years ago that

> in determining whether an individual is "in custody" and entitled to Miranda warnings, the relevant inquiry is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. The test is objective from the viewpoint of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question.

State v. Anderson, 937 S.W.2d 851, 852 (Tenn. 1996). Factors relevant to making the objective assessment of whether a person was in custody at the time he or she was questioned include

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. at 855. This list of factors is not exclusive, and the inquiry is "very fact specific." Id.

---

[9] Following Miranda, the Supreme Court clarified in California v. Beheler, 463 U.S. 1121 (1983), that,

> [a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.

Id. at 1125 (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

28

With regard to the issue of whether the Defendant was "in custody" while Detective Malach was interviewing her at the police station, the trial court allowed the defense to put on additional proof at a subsequent hearing. At this hearing, the Defendant testified that she drove herself to her job on the morning of September 14, 2011, arriving between 7:30 and 8:00 a.m. after about a thirty-minute drive. She first met Detective Malach at her workplace at approximately 10:00 a.m. that morning. She spoke to him there for approximately ten minutes, and he asked her if she would accompany him to the police station. She agreed, and he allowed her to retrieve her purse before she got in his car. When she asked about her car, "he told me just leave it there at the time and we would be back shortly to get it."

She got in the front passenger seat of Detective Malach's car, and "he immediately locked the doors." At that point, she testified, she "felt like [she] had no choice in the matter anymore." When they arrived at the station, they entered through a side door. Detective Malach asked her to sit on a bench in the hallway, which she did. The Defendant remained on the bench, unrestrained and unaccompanied, for approximately thirty minutes. During this time, she had her purse and her cellphone with her. Although she received a phone call from her grandmother while she sat on the bench, she did not answer her phone because she "didn't know if [she] was allowed to use [her] cell phone at the time."

Eventually, Detective Malach escorted the Defendant into a small, windowless room next to the bench. Detective Malach left briefly and then returned with a bottle of water for the Defendant. He closed the single door. The Defendant sat in a chair with her back to the door and facing Detective Malach. At some point during the interview, Detective Malach left the room and she remained alone for approximately thirty minutes. The Defendant testified that, once she was in the room, she did not feel like she could leave. She added that she did not remember any doors other than the first one she had used to enter the station and then the door into the interview room.

On cross-examination, the Defendant agreed that, the "whole time" that she was with Detective Malach, he was "very pleasant" to her. She also acknowledged that, during the time that she was seated on the bench, she could have gotten up and walked out of the station. At no time during her interview with Detective Malach did he tell her that she was under arrest.

The trial court asked the Defendant if, at any time, she had asked Detective Malach if she could leave. She said that she had not, that it was "not [her] personality to do that." She denied that Detective Malach had ever made any display of force to her.

After considering this additional proof, the trial court again concluded that the Defendant had not been in custody during her interview with Detective Malach at the police station. The trial court meticulously considered the <u>Anderson</u> factors, noting that

29

the interview began at approximately 9:00 in the morning and that the interview took place at the police department; the interview there took approximately ninety minutes; the character of the questioning was based on cooperation and was not "unfair"; that Detective Malach's demeanor was "excellent," noting particularly that he was "pleasant," "polite," "never . . . rude" or "argumentative," that he "never . . . raised his voice" or "talked down to her"; that the Defendant was driven to the police station in Detective Malach's vehicle, in the front seat, with the car doors locked; that Detective Malach was the only officer present during the interview; that there was no show of force or authority; that, while the door to the interview room was closed most of the time, it was also open some of the time; that the Defendant was "very responsive" to Detective Malach's questions and was not badgered or belittled; that the Defendant's verbal and non-verbal responses were normal and natural and not the result of force, coercion or pressure; that, while the Defendant was confronted with the fact of the deceased infant having been discovered in the laundry basket, she was not confronted with Detective Malach's suspicions of guilt; and that the Defendant had been told that she could refuse to answer questions. With respect to the Defendant's claim that she felt that she was not free to leave once she got into Detective Malach's car and he locked the doors, the trial court noted that the Defendant had sat on a bench in the hallway of the police department for approximately thirty minutes after she arrived and that she was not under any restraint during this time period. The trial court found that a reasonable person in the Defendant's position would not have considered herself under arrest under these circumstances.

Based on these findings, the trial court concluded that the Defendant "was not in custody" and "was not deprived of her freedom in any significant way" such that "Miranda had no application to the interview at the police department."

After our thorough review of the proof adduced at both suppression hearings as well as our careful review of the videotape of the interview, we agree with the trial court. Viewed objectively, a reasonable person in the Defendant's position would not have "consider[ed] himself or herself deprived of freedom of movement to a degree associated with a formal arrest." Anderson, 937 S.W.2d at 855.

Detective Malach asked the Defendant to accompany him to the police station from her place of work, and she agreed. Although he locked the doors of his car after she got in, the Defendant sat in the front of the car and was not handcuffed. She had her purse and her cell phone with her. Before the interview at the police station began, the Defendant spent a considerable period of time sitting unrestrained and unaccompanied on a bench in a hallway, with her phone. At the beginning of the interview, even though he was not required to, Detective Malach advised the Defendant that she did not have to speak with him. During the interview, after learning that the Defendant had given birth to a second infant, Detective Malach left the Defendant alone in the interview room for several minutes with the door ajar. Detective Malach's questioning was appropriate to his stated goal of learning how a dead infant had come to be placed in a laundry basket in

30

the Defendant's bedroom and was not focused on obtaining a confession to a crime. Cf. Dailey, 273 S.W.3d at 103-04 (holding that the defendant was in custody prior to being given Miranda warnings in part because two police officers interrogated the defendant with "focused accusations and questions" about his involvement with the victim's death and that they told the defendant that they "already had sufficient evidence to convict him of first degree murder").

In sum, we hold that the Defendant was not in custody. Therefore, Detective Malach was not required to provide the Defendant with the Miranda warnings prior to commencing his interview of her. Accordingly, we need not address the Defendant's challenges to the efficacy of the Miranda warnings that Detective Malach provided or of the validity of her rights waiver.[10] The trial court did not err in denying the Defendant's motion to suppress her statement on these bases.

*Exclusion of Dr. Kenner's Testimony at Trial*

The Defendant's final issue arises from the trial court's refusal to allow Dr. Kenner to testify at trial about the reliability of her statements to Detective Malach. Prior to ruling, the trial court allowed the defense to make an offer of proof through questions and answers.

Initially, defense counsel asked Dr. Kenner what "particular qualifications" he had that qualified him to opine "with regard to the reliability of statements or confessions." Dr. Kenner responded,

> I have done a significant amount of research. I have given—on interrogation techniques, false confessions, and the coercive elements in interrogations, I have lectured on this at local, national, and international meetings in areas of psychiatry and psychiatric law. I have been referenced in publications—well, one is by Dr. Snyder Sherman in her book called The Troops Returning from Iraq. And so I have significant knowledge in that respect.

Based on his avowed expertise, Dr. Kenner opined that the Defendant's "law enforcement interrogation by Detective Malach took place proximal to delivery during a time of increased vulnerability, both physical and emotional. Because of her dissociative symptoms and her medical condition, she was particularly vulnerable to suggestion, manipulation, and subversion of her reality." Dr. Kenner also opined that the Defendant's statement was "so contaminated by Detective Malach's narrative that we don't know if it is true or not."

---

[10] Moreover, we agree with the Court of Criminal Appeals' substantive analyses and conclusions regarding these issues. See Lowe, 2016 WL 4909455, at *19-22.

The following colloquy between the trial court and Dr. Kenner also took place:

THE COURT: [H]ave you ever been qualified to testify as an expert in state court about the reliability of statements to police officers?

THE WITNESS: I've been allowed to review interview statements, yes.

THE COURT: And have you testified to the same subject matter, same type of testimony, that you have today?

THE WITNESS: Very similar, in which I went over the narrative.

We note that the record does not contain a copy of Dr. Kenner's curriculum vitae.

During his cross-examination, Dr. Kenner maintained that, although Detective Malach began questioning the Defendant without knowing the facts that resulted in Mr. Lowe finding a dead infant in the Defendant's bedroom,

he pursued his narrative as if he knew exactly what had happened. He stereotyped the case. There is a stereotype within law enforcement for these kinds of cases. And, in my opinion, Detective Malach simply followed that stereotype rather than remaining open to all of the possibilities because he didn't explore anything other than what was in his stereotypical narrative.

The following colloquy between the prosecutor and Dr. Kenner ensued:

Q. I understand you're critiquing his interview technique, but, Doctor—

A. No, I'm—I'm sorry. I'm critiquing his thinking.

Q. How do you know what his thinking is, Dr. Kenner?

A. Because of how he conducted himself in the interrogation.

Q. But to answer my question earlier, would you agree that Detective Malach did not know what the facts were?

A. Absolutely.

Q. And would you agree that he was trying to determine what the facts were?

32

A.  No.

Q.  You would not agree to that?

A.  No.  He had his stereotype of what the case involved, and that is all that he would allow Lindsey Lowe to give voice to.

Q.  How do you know he had a stereotype as to what the case involved, Dr. Kenner?

A.  Because there is a stereotype within law enforcement of what—if a woman ends up delivering a baby that is dead, how it died.  And that is typically one in which she smothers the child to prevent discovery of her pregnancy, the embarrassment that would follow, et cetera.

Q.  How do you know, Dr. Kenner, that law enforcement has that stereotype that they go around with?

A.  Well, one is the way Detective Malach jumped to conclusions.  He always jumped in the same direction and he always jumped in the direction of the stereotype so that that is a significant clue to me that he was operating off of that stereotype.

Q.  I'm wondering, Dr. Kenner, how you know that there's a stereotype among all law enforcement that women smother their babies.

A.  That is what has been written about in law enforcement journals.  It's what—the way interrogations are—the information that law enforcement are supposed to get [in] an interrogation.  If their course is on interrogation about women who just delivered and their babies are dead, that's what's taught.

Q.  In every law enforcement jurisdiction?

A.  You know, I don't know about every law enforcement jurisdiction.  What I do know about is the way Detective Malach structured his interrogation of her, and it was exactly by the book.  There was nothing that varied from that in the slightest.  If he had, I would certainly be saying something different.

In ruling that Dr. Kenner would not be allowed to testify in this regard, the trial court stated,

> In evaluating his credibility, his testimony appears to be personal rather than professional. . . . It's not reliable. I find that his testimony is not credible as to this particular issue and it will not substantially assist the jury. His credibility and bias is clear. Therefore, this testimony will not be allowed.
>
> . . . .
>
> He just is not qualified in this court to give that testimony.

As set forth above, this Court reviews a trial court's decision regarding the admissibility of expert testimony for an abuse of discretion. See Ballard, 855 S.W.2d at 562. A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the proof, or utilizes reasoning that causes an injustice to the complaining party. Konvalinka, 249 S.W.3d at 358.

Also as set forth above, Tennessee Rule of Evidence 702 provides that, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise," and Tennessee Rule of Evidence 703 provides, in pertinent part, that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

The Defendant asserts in her brief to this Court that the trial court "had no right to determine Dr. Kenner's bias or credibility." However, while the trial court certainly referred to Dr. Kenner's bias and credibility, the actual basis for the trial court's ruling was its conclusion that Dr. Kenner was not sufficiently qualified to testify as an expert about the reliability of the Defendant's statements in light of the manner in which Detective Malach conducted his interview. We also glean from the trial court's ruling a concern that Dr. Kenner's opinions and inferences were not based on sufficiently trustworthy data.

Initially, we note that the Court of Criminal Appeals thoroughly analyzed this issue and concluded that the trial court did not abuse its discretion in excluding Dr. Kenner's testimony about the reliability of the Defendant's confession in light of Detective Malach's interview technique. See Lowe, 2016 WL 4909455, at *36-42. We agree with the lower court's analysis and conclusion on this issue.

34

Moreover, we emphasize that it is a trial court's responsibility to act as a gatekeeper regarding the admissibility of expert testimony. State v. Scott, 275 S.W.3d 395, 401 (Tenn. 2009). In this role, the trial court must ensure that the proffered expert "'whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Brown v. Crown Equip. Corp., 181 S.W.3d 268, 275 (Tenn. 2005) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)). Thus, the trial court "must assure itself that the [expert's] opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997). This reliability analysis includes "four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability." Scott, 275 S.W.3d at 402.

We note that the foundation of Dr. Kenner's opinion that the Defendant's statement to Detective Malach was not reliable was based, in turn, on his opinion about what Detective Malach was thinking during his interview of the Defendant. That is, Dr. Kenner engaged in sheer bootstrapping to support his claim that Detective Malach had engaged in an interviewing technique based on an alleged stereotype allegedly taught to police officers. Dr. Kenner claimed that the stereotype of a woman smothering her newborn infant "has been written about in law enforcement journals," but did not identify any of these journals. He stated that this stereotype was "what's taught" to law enforcement officers but admitted that he did not know whether this stereotype was taught in every jurisdiction. There was no proof in the record that Detective Malach had been exposed to, or schooled in, this particular stereotype other than Dr. Kenner's claim that Detective Malach "jumped to conclusions . . . in the direction of the stereotype" and that Detective Malach "structured his interrogation of [the Defendant] . . . exactly by the book." In essence, Dr. Kenner testified that his opinion was valid and trustworthy because he said it was. However, "[j]ust because an expert is speaking does not make what he or she is saying sufficiently reliable to be admitted into evidence as expert testimony." Scott, 275 S.W.3d at 402.

We hold that the trial court did not abuse its discretion in ruling inadmissible Dr. Kenner's proffered testimony about the reliability of the Defendant's statement in light of Detective Malach's interviewing technique. The Defendant is not entitled to relief on this basis.

## **Conclusion**

For the reasons stated herein, we affirm the Defendant's judgments of conviction.

_____

JEFFREY S. BIVINS, CHIEF JUSTICE

36