IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 9, 2019

**STATE OF TENNESSEE v. ROBERT (BOB) GEORGE KEAST**

Appeal from the Circuit Court for Benton County
No. 2017-CR-66     C. Creed McGinley, Judge

_____

**No. W2018-00559-CCA-R3-CD**

_____

The Defendant, Robert (Bob) George Keast, was convicted by a Benton County Circuit Court jury of domestic assault, a Class A misdemeanor, and was sentenced to eleven months and twenty-nine days, suspended to supervised probation after service of thirty days.  On appeal, he argues that the evidence is insufficient to sustain his conviction and that the trial court erred in excluding proof of the victim's prior arrest.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which J. ROSS DYER, J., joined. CAMILLE R. MCMULLEN, J., concurred in results only.

Matthew C. Edwards, Bolivar, Tennessee; Stephen L. Hale, Bolivar, Tennessee; and Robert T. Keeton, Huntington, Tennessee, for the appellant, Robert (Bob) George Keast.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Matthew F. Stowe, District Attorney General; and Michelle Morris-DeLoach, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In October 2017, the Defendant was charged with one count of the domestic assault of his wife, Judy Keast.  Prior to trial, he filed a notice of his intent to assert the affirmative defense of self-defense.  The State filed a motion in limine to prohibit the

Defendant from introducing evidence of the victim's prior conviction for domestic assault and, after a hearing, the trial court granted the State's motion. The case proceeded to trial.

The victim testified that she and the Defendant began dating in February 2010, and they dated for six years before marrying. The victim described the early part of their relationship like "a fairy tale" and a "[v]ery happy" time. After the first year and a half, she and the Defendant experienced some "weak moments" and "trying times" in their relationship but got married nonetheless. The victim elaborated that the Defendant would get very angry at times, and she "constantly felt like [she] was walking on eggshells." Despite their problems, the victim thought that she could help the Defendant and encouraged him to go to a doctor for medication to "level" him out. The Defendant eventually saw a doctor, who prescribed lithium for bipolar disorder. The Defendant took his medication most days, but there were many days the victim did not see the Defendant take it. The victim said that she noticed a difference in the Defendant's mood when he took it.

In December 2016, there was a fire at the Birdsong Resort and Marina where the victim and the Defendant lived and worked, and one of the buildings burned to the ground. The Defendant changed after the fire. He withdrew and became erratic, and he got into conflicts with his employees, causing many to quit. The Defendant had more regular outbursts leading up to the offense. He would not speak to the victim at all and was sleeping away from their home. The day before the offense, problems at work had increased the Defendant's temper, and he was yelling at some of his employees. The victim and another man had to jump between the Defendant and the employee to prevent a confrontation. The Defendant threw a two-way radio on the ground and ordered the employee off the property. The victim was embarrassed, humiliated, and angry about the confrontation and told the Defendant that she could not believe what he had done.

The victim testified that the next day, she and the Defendant had a normal day at work, except he would not acknowledge her when she walked into a room. When she tried to talk to him about things happening at the resort, "he said something to the effect of, 'Can you not handle a GD thing?'" He also told some of the women who worked with them that the victim was losing her mind, and they should not take orders from her. The victim said that she felt humiliated and cried during the day.

That evening, after all the employees had gone home, the victim was sitting in her office when she heard the door open and the sound of someone putting ice in a glass. She looked and saw the Defendant pull out a bottle of whiskey, and she asked him to make a drink for her as well. After a curt exchange, the Defendant prepared a drink for the victim, and the two of them rode around the resort on a golf cart. When they were done,

they made another drink and decided to go home and eat. While the Defendant was preparing food, the victim tried to talk to him about some phone calls she had received that day from people not happy with their accommodations. The Defendant "c[a]me apart" at the conversation, saying, "That's why I have you here is to handle these kinds of things. I don't want to be bothered with this. I'm trying to run the rest of the resort."

The victim got out of the chair she was sitting in, and the Defendant came toward her. He pushed her onto the couch, which caused a lamp to fall on the floor. The victim told the Defendant that he was tearing up their house and pushed him away from her. She picked up the lamp and took it into the spare bedroom. When she returned, she told the Defendant that he was destroying their marriage, and he slammed down a photograph from their wedding on the end table and said, "That's what I think of our marriage." The Defendant began calling the victim names and cursing at her before eventually telling her, "I'm going to kill you." She tried to leave the house, but the Defendant grabbed her by the hair. He took her glasses off, cleared his throat, and spat in her face.

The Defendant pulled the victim by her hair down to the ground and straddled her. She began flailing her arms because he had his hand drawn back in a fist, and she thought he was going to kill her. She tried to defend herself by kneeing him in the groin, temporarily immobilizing him, and she ran out the door screaming, "He's killing me." She ran to a nearby house and someone called 911. The victim identified photographs of her injuries for the jury. She said she sustained bruises on her arms and shoulders, a cut on her hand, and bruising on her legs.

On cross-examination, the victim stated that she was not trying to agitate the Defendant and did not hit the Defendant in the head or elsewhere. However, she admitted that she "pushed him backwards off of [her] at one point when he pushed [her] down on the couch to roll him over so that [she] could get off the couch." She also admitted that her hands came into contact with the Defendant's face when she was "flailing" her arms "trying to keep him from hitting [her]." The victim said that she was the one who took the photographs of her injuries that were entered as exhibits. The defense showed the victim photographs of the Defendant depicting injuries he alleged to have sustained during the altercation, but the victim maintained that "he didn't look like that when [she] left."

Sergeant Bobby Ferguson with the Benton County Sheriff's Office responded to the domestic disturbance call and encountered the victim, whom he described as "distraught" and "terrified." The victim provided a statement in which she said that the Defendant was "angry, drinking and combative." She said that the Defendant pulled her hair, threw her to the floor, and hit her several times, although she was able to block each hit. She kept apologizing and begging him to stop, but he kept hitting her and throwing

her around. The Defendant told her that he would make sure she went to jail. Sergeant Ferguson agreed that the previously admitted photographs of the victim's injuries accurately depicted her injuries that he observed that night.

After obtaining the victim's side of the story, Sergeant Ferguson went to the victim's and the Defendant's residence. The Defendant was on the phone and, when Sergeant Ferguson asked him to hang up, the Defendant said that he was talking to his attorney and put the phone on speakerphone and set it on the counter. The Defendant told Sergeant Ferguson that he and the victim got in an argument over a golf cart accident, which conflicted with what the victim had told him. The Defendant also denied that he had been drinking, although he was obviously intoxicated. The Defendant was ultimately arrested and, while being transported to the jail, admitted to another officer that he had been drinking. Sergeant Ferguson recalled that he examined the Defendant's head and face with a flashlight and noticed what appeared to be scratches on his face. The Defendant never told him that the victim hit him in the head with a lamp. Sergeant Ferguson instructed another officer to photograph the Defendant, which was done in the booking room at the jail when the Defendant was being processed.

Officer Russell Wood with the Benton County Sheriff's Office also responded to the scene of the incident between the Defendant and the victim. He observed that the victim was "[h]ysterical, shaking, and very, very nervous." She reported that she and the Defendant "had got into a scuffle, an argument." Officer Wood noted that the victim "had several marks on her arms and her finger area[,]" and he took photographs of her wounds. He emailed the photographs to Sergeant Ferguson that night and had not seen them since that time. Officer Wood said that the Defendant had "[s]everal cuts on his face . . . and a bruise on his chin[,]" and he took photographs of the Defendant's injuries as well.

Following the conclusion of the proof, the jury convicted the Defendant as charged of domestic assault.

## ANALYSIS

### I. Sufficiency

The Defendant argues that the evidence is insufficient to sustain his domestic assault conviction. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions

whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A person commits domestic assault who commits an assault as defined in § 39-13-101 against a domestic abuse victim, which includes an adult who is a current or former spouse. Tenn. Code Ann. § 39-13-111(a)(1), (b). As charged in the indictment, assault is accomplished when the defendant intentionally or knowingly causes bodily injury to another. Id. § 39-13-101(a)(1). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Id. § 39-11-106(2).

In the light most favorable to the State, the proof at trial shows that the Defendant grabbed the victim by the hair, spat in her face, forced her to the ground, straddled her, and slapped her in the face and tried to hit her. The victim recalled having bruises on her arms, shoulder, and legs, as well as a cut on her hand. Sergeant Ferguson also recalled that the victim had visible injuries, some of which were captured in photographs presented to the jury. It is undisputed that the victim was the Defendant's wife at the time of the offense. This proof satisfied all of the elements of domestic assault, and a rational trier of fact could have found so accordingly.

- 5 -

In his brief, the Defendant essentially challenges the victim's credibility and questions why there were not photographs of all her injuries. However, questions concerning the credibility of the witnesses were resolved by the jury as the trier of fact. In addition, the victim's testimony was sufficient to establish the elements of the offense without need for any photographic evidence. To the extent there was a conflict about who took the photographs of the victim's injuries, the victim and Sergeant Ferguson both agreed that the photographs depicted the victim's injuries from that night.

## II. Prior Arrest

The Defendant argues that the trial court should have allowed him to introduce evidence that the victim had a prior arrest for domestic assault to show that she was the first aggressor in support of his self-defense claim. The State responds that the Defendant waived the issue because he failed to make an offer of proof on the point and did not articulate his first aggressor theory until the motion for new trial.

A defendant may not challenge a trial court's ruling excluding evidence unless "the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context." See Tenn. R. Evid. 103(a)(2). For proper appellate review of excluded evidence, "it is fundamental that such evidence be placed in the record in some manner." State v. Lowe, 552 S.W.3d 842, 864 (Tenn. 2018) (quoting State v. Goad, 707 S.W.2d 846, 852-53 (Tenn. 1986)). "Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded." State v. Hall, 958 S.W.2d 679, 691 n.10 (Tenn. 1997) (citations omitted).

Before trial, the State sought to exclude evidence of the victim's conviction for domestic assault and requested a hearing on the matter outside the presence of the jury. If the Defendant filed a response to the State's motion, he failed to include it in the appellate record. The only discussion about the proposed evidence occurred right before opening statements and consisted of the trial court stating that it was granting the State's motion and defense counsel commenting, "Their motion in limine was based on a conviction. There was no conviction. It's a prior bad act, but there is no conviction."

On appeal, the Defendant describes the circumstances of an alleged arrest of the victim in his brief, and he made similar representations about the circumstances of the arrest for the first time in his motion for new trial. However, at no point below or on appeal has the Defendant indicated what proof he would have offered, what witnesses he would have called, or what witnesses he would have cross-examined differently. We, therefore, agree with the State that in light of the Defendant's failure to offer proof on

this issue and because the substance of the evidence is not apparent from the context, he may not now litigate it on appeal.

In addition, the Defendant has arguably waived this issue because he did not articulate his first aggressor theory until his motion for new trial. Cf. State v. Adkisson, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994) ("When, as here, a party abandons the ground asserted when the objection was made and asserts completely different grounds in the motion for a new trial and in this Court, the party waives the issue.").

Moreover, the Defendant is not entitled to relief under the plain error doctrine, which provides that where necessary to do substantial justice, an appellate court may take notice of a "plain error" not raised at trial if it affected a substantial right of the defendant. Tenn. R. Crim. P. 36(b). In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting Adkisson, 899 S.W.2d at 641-42). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Smith, 24 S.W.2d at 283.

Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion[.]" Tenn. R. Evid. 404(a); see also Tenn. R. Evid. 404(b). However, if a defendant raises a claim of self-defense, then Tennessee Rule of Evidence 404(a)(2) "permits the defendant to offer proof of the victim's 'pertinent' character for violent behavior to help establish that the victim was the aggressor." Neil P. Cohen et al., Tennessee Law of Evidence, § 4.04[5][c] (6th ed. 2011). Pursuant to Tennessee Rule of Evidence 405(a), however, this substantive evidence may be established only by reputation or opinion and specific acts may be inquired into only on cross-examination. Id.; see State v. Ray, 880 S.W.2d 700, 705-06 (Tenn. Crim. App. 1993).

If the issue of first aggressor has first been raised by the evidence, proof of the victim's prior violent acts may be admissible through the direct examination of a witness for the purpose of corroborating the defendant's claim of self-defense. See State v. Ruane, 912 S.W.2d 766, 779-80 (Tenn. Crim. App. 1995); State v. Hill, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994); State v. Furlough, 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990). Before admitting proof of first aggression, the trial court must determine that the following conditions are satisfied:

1. Self-defense must be raised by the proof and not by the words and statements of counsel.

2. The trial judge must determine whether or not there is a factual basis underlying the allegations of tendencies of first aggression.

3. The trial judge must determine whether or not the probative value of the evidence is outweighed by the potential for unfair prejudice.

See Ruane, 912 S.W.2d at 781.

Here, the Defendant is not entitled to plain error relief because consideration of the issue is not necessary to do substantial justice.  The trial court apparently did not find that self-defense was fairly raised by the proof.  The Defendant, although indicating his intent to pursue a self-defense theory before trial, did not address the lack of a self-defense instruction during trial or in his motion for new trial.  Given the absence of a self-defense instruction, any first aggressor proof would have been irrelevant to the jury's determination.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE