# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 1, 2020 Session

## STATE OF TENNESSEE v. ANTONIO ROBINSON

**Appeal from the Criminal Court for Shelby County**
**No. 16-02201  Paula L. Skahan, Judge**

---

### No. W2019-01313-CCA-R3-CD

---

The Defendant-Appellant, Antonio Robinson, was convicted by a Shelby County jury of aggravated robbery, facilitation of aggravated assault, and criminally negligent homicide in violation of Tennessee Code Annotated sections 39-13-402, 39-11-403, 39-13-102, and 39-13-212.  On appeal, the Defendant-Appellant claims: (1) the trial court erred in denying his motion to suppress, and (2) the evidence presented at trial was insufficient to support his convictions.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Phyllis Aluko, District Public Defender, and Glover Wright, Assistant Public Defender, for the Defendant-Appellant, Antonio Robinson.

Herbert H. Slatery III, Attorney General and Reporter; Ronald Coleman, Assistant Attorney General; Amy Weirich, District Attorney General; and Theresa McCusker, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On August 18, 2015, the Defendant and his co-defendant, Michael Wilson, approached a home on Oakview Street.  Dyrell Sims and his friend, Bryant James, were sitting on the front porch of the home when the Defendant and codefendant Wilson ran onto the porch, drew their guns, and began robbing them.  During the robbery, Sims struggled with the perpetrators and was fatally shot.  Law enforcement received a tip from CrimeStoppers implicating the Defendant in the crime and placed his photo in a line up. The surviving victim, Bryant James, viewed the lineup and identified the Defendant as one of the perpetrators.  On September 24, 2015, three days after James identified the Defendant, law enforcement interviewed the Defendant, who provided a statement

admitting his involvement in the robbery and Sims' death. The Defendant was subsequently charged with felony murder, attempted first-degree murder, employing a firearm during the commission of a dangerous felony, and aggravated robbery. See Tenn. Code Ann. §§ 39-13-202(a)(2), 39-12-101, 39-17-1324, 39-13-402.

**Suppression Hearing.** On July 13, 2016, the Defendant filed a motion to suppress the statement he provided to law enforcement. In his memorandum to support the motion, the Defendant alleged he was not adequately advised of his right to be free from self-incrimination, his waiver of this right and his subsequent statement were not knowing, voluntary, or intelligent, and his statements were improperly elicited in the absence of counsel.

The Defendant was questioned by law enforcement at a Memphis Police Department (MPD) homicide office from the evening hours of September 23, 2015, to the early morning hours of September 24, 2015. Initially, the Defendant came to the office to be questioned about a case, which we will refer to as the "Scooter" case. Later, while still at the office, the Defendant was questioned about a second case, which we will refer to as the instant case. The two cases are unrelated. The Defendant gave a written statement in each case. For the sake of clarity, we will refer to the Defendant's statement regarding the "Scooter" case as the first statement, and the Defendant's statement regarding the instant case as the second statement. The following testimony was offered at the Defendant's December 4, 2018 suppression hearing.[1]

Lieutenant James Sewell, a sergeant for the Homicide Bureau of the MPD, interviewed the Defendant on September 23, 2015.[2] Lieutenant Sewell testified he had been looking for the Defendant because he wanted to question him about the "Scooter" case. At some point on September 23, the Defendant's mother called the department and said she would bring the Defendant to the homicide office. The Defendant arrived at the office at 9:00 that evening, accompanied by family members who were asked to wait in the lobby, and was taken to an interview room.

Upon entering the interview room, Lieutenant Sewell and his colleague, Detective Dandridge, began to "chit-chat" with the Defendant about personal topics to get him "relaxed." Lieutenant Sewell provided the Defendant with an advice of rights form, which was not included in the record on appeal, and asked him to read it aloud. After reading it, the Defendant indicated that he understood his rights, asked no questions, did not request an attorney, and signed the form. Lieutenant Sewell testified that the Defendant was not

---

[1] We recognize that over two years passed between the filing of the Defendant's Motion to Suppress and the suppression hearing. The record does not provide an explanation for this lapse in time.

[2] James Sewell was a sergeant at the time of the events but was promoted to lieutenant sometime prior to the suppression hearing.

pressured or coerced to sign the form and did so voluntarily. After administering the advice of rights form, Lieutenant Sewell proceeded to question the Defendant about his possible involvement in the "Scooter" case. Shortly after the interview began, Lieutenant Sewell determined that the Defendant was a witness in the "Scooter" case and not a suspect. At 12:40 in the morning on September 24, Lieutenant Sewell began taking the Defendant's written statement, which the Defendant read and made corrections to before signing. The Defendant's statement was not audio or video recorded. Lieutenant Sewell testified that the Defendant never asked for an attorney during the course of their interaction.

Lieutenant Sewell stated that he did not talk to the Defendant about the instant case and said he did not know about the case at the time. However, after speaking with the Defendant, Lieutenant Sewell notified the lead investigator of the instant case, Detective Spearman, that the Defendant was at the office because he knew "Spearman was interested in talking" to the Defendant.

On cross-examination, Lieutenant Sewell testified that he spoke with the Defendant's mother on the phone before she brought him in for questioning and indicated that he wanted to speak with the Defendant specifically about the "Scooter" case. Lieutenant Sewell clarified that he administered the advice of rights form at 9:55 in the evening, before he interviewed the Defendant. When advising the Defendant of his rights, Lieutenant Sewell informed him these rights were specific to the "Scooter" case.

Lieutenant Sewell testified that at some point during the interview, he became aware that the Defendant was a suspect in the instant case, though he does not remember when or how he discovered this. Detective Dandridge, who interviewed the Defendant alongside Lieutenant Sewell, was investigating the instant case and took a statement from codefendant Wilson three days before the Defendant's interview took place. Lieutenant Sewell could not recall whether he was aware that Detective Dandridge was investigating the instant case.

On re-direct examination, Lieutenant Sewell stated that the Defendant did not appear to be under the influence and was never tired or falling asleep.

Detective Michael Spearman, who worked for the MPD Homicide Bureau, interviewed the Defendant about the instant case after Lieutenant Sewell notified him that the Defendant was in the office. Prior to the interview, Detective Spearman had received a CrimeStopper's tip implicating the Defendant. Detective Spearman testified that upon entering the room, he and his colleague, Detective F. Frias, orally advised the Defendant of his Miranda rights and the Defendant agreed to speak with them.

When asked how he Mirandized the Defendant, Detective Spearman stated that he "read over the Advice of Rights Form" with the Defendant. When shown a copy of the Defendant's second statement, Detective Spearman stated that the rights listed on the first page of this document was the "Advice of Rights" he was referring to, not a separate advice of rights form, like the one utilized by Lieutenant Sewell. Detective Spearman testified that he orally advised the Defendant of these rights.

Detective Spearman said the Defendant seemed to understand his rights, did not ask any questions, signed and initialed the statement, and never requested an attorney during their interaction. He confirmed that the Defendant's initials on his second statement was the only written documentation showing the Defendant received renewed Miranda warnings. Detective Spearman testified that the Defendant was not forced or coerced to give a statement and did so voluntarily. While in Detective Spearman's presence, the Defendant identified and made handwritten notes on several photographs of the crime scene, codefendant Wilson, and the victims, Bryant James and Dyrell Sims.

During the interview, the Defendant was given pizza and water and was offered bathroom breaks. Detective Spearman stated that the Defendant did not appear to be tired or under the influence.

On cross-examination, Detective Spearman stated that he developed the Defendant as a suspect based on the statement the surviving victim, Bryant James, gave to law enforcement along with the CrimeStoppers tip. Detective Spearman had previously interviewed codefendant Wilson, alongside Detective Dandridge. He testified that the entire homicide team, which consisted of seven people, were working on the instant case. Detective Spearman stated that prior to the Defendant coming into the homicide office, he told Lieutenant Sewell that he was trying to locate the Defendant as a possible suspect in the instant case.

Detective Spearman said Lieutenant Sewell notified him that the Defendant was at the homicide office at 1:43 in the morning, while he was en route to the office from another investigation. Lieutenant Sewell told Detective Spearman that he had given the Defendant his Miranda rights, though Detective Spearman was aware these rights were given in relation to the "Scooter" case. After Detective Spearman entered the interview room, the same room where Lieutenant Sewell interviewed the Defendant, he told the Defendant he wanted to speak with him about a second unrelated case.

Detective Spearman and Detective Frias began speaking to the Defendant at 1:48 in the morning. They told the Defendant that they were not accusing him of anything and that he was not under arrest. Detective Spearman asked the Defendant if he knew what he wanted to speak to him about and the Defendant indicated he did not. Detective Spearman

testified that he always advises suspects of their <u>Miranda</u> rights before speaking with them. He stated that while he was trained to use a new, separate advice of rights form before speaking with a suspect, he did not do so before interviewing the Defendant. Detective Spearman testified that he utilized the advice of rights form that Detective Sewell had previously completed and had the Defendant read the form aloud. After reading the form aloud, the Defendant said that he wanted to give a statement and did not need an attorney.

Detective Spearman prepared the state report and supplement for this case, which were not included in the record on appeal. He testified that the supplement stated the Defendant signed a separate advice of rights form, apart from the rights listed on the first page of his second statement, before agreeing to speak with him about the instant case. However, Detective Spearman admitted he did not know what the supplement was referring to. The Defendant signed the advice of rights form used by Lieutenant Sewell only once, before he was questioned about the "Scooter" case, and as he previously stated, he did not complete a second advice of rights form. Additionally, Detective Spearman clarified his earlier testimony, stating that the Defendant did not initial next to the rights on the first page of his second statement until 5:20 in the morning, after he had been questioned.

After the Defendant was interviewed, he was moved from the interview room to an investigator's desk to give his typed statement, where he was handcuffed to a chair. At this point, detectives advised the Defendant that he was under arrest. The detectives did not audio or video record the Defendant's interview or statement. Detective Spearman stated that he has never audio or video recorded a suspect's statement because he had been trained that there were downsides to doing so, though he was never explicitly told not to record statements.

Detective Spearman arrested the Defendant after he finished taking his written statement. After refreshing his memory with the Defendant's record of arrest, which was not included in the record on appeal, Detective Spearman confirmed that it was time stamped at 11:30 in the evening on September 23. The record of arrest stated that the Defendant was being charged with first degree murder in the perpetration of a felony. Detective Spearman testified that he did not create the record of arrest and stated that "another investigator actually completed the arrest ticket. . . just because the tickets are pretty much [computer generated]." However, the record of arrest listed Detective Spearman as the arresting officer and contained his signature and initials. Detective Spearman testified that he signed the record of arrest after consulting with Assistant District Attorney Ray Lapone, who advised him to charge the Defendant with first-degree murder.

- 5 -

On re-cross examination, Detective Spearman testified that after the Defendant began making incriminating statements in the interview room, he was not free to leave, regardless of whether he had authority from the attorney general to arrest the Defendant.

Following the testimony at the suppression hearing, the trial court issued a written order denying the Defendant's motion to suppress on March 1, 2019. The order stated, in pertinent part:

> [P]rior to questioning the defendant, Detective Spearman testified that he again reviewed the prior Advice of Rights form with the Defendant. The statement given by [the] defendant contains a recitation of those rights and an acknowledgment by the Defendant that he was informed of those rights and chose to waive them. Nothing in the record indicates [that the] defendant was incapable of understanding that officer Spearman was questioning him about a different matter. Thus, under the totality of the circumstances, the court finds that the warnings provided to the defendant were sufficient to appraise him of his rights and the consequences of waiv[ing] those rights.
> …
> Although the warnings were only given orally and no additional written waiver was executed… a written waiver is not required to establish the constitutionality of the statement.
> …
> Although officers did not initially inform the defendant that he was a suspect in the instant homicide, they did inform him that officers wanted to discuss the events of August 18, 2015[,] with him and eventually their questioning clearly indicated that they were interested in discussing the homicide for which [the] defendant was subsequently charged…. [P]rior to Detective Spearman's questioning the defendant was orally advised of his rights and the defendant acknowledged as part of the statement that he was read his rights and was waiving those rights. He initialed that part of the statement…. [T]he court finds nothing about this procedure rendered the Defendant's confession constitutionally inaccurate.
> …
> Even if the detectives somehow conspired to get the defendant in for questioning, there is nothing to suggest this fact, alone, was insufficient to overbear his will and render his waiver involuntary. Thus, the court finds nothing to suggest the defendant's waiver was not knowing, voluntary, and intelligent.
> …

This court finds the preparation of a computer-generated arrest ticker did not initiate formal proceedings in this case. Thus, the Sixth Amendment right to counsel was not implicated.

…

[T]he court finds the State established by a preponderance of the evidence that the defendant was properly informed of his Miranda rights and executed a knowing, voluntary and intelligent waiver of those rights prior to questioning. The court further finds [the] defendant never invoked his right to counsel and was not entitled to counsel at the time of questioning without such an invocation.

**Trial.** The following proof, relevant to the Defendant's issues on appeal, was adduced at the Defendant's March 4, 2019 trial.

Dorothy Sims, the mother of the victim, Dyrell Sims, testified that her son was thirty-three years old and in good health at the time of his death. She stated that her son died on August 20, 2015, two days after he was shot.

Marcus Kirkwood, an MPD officer, responded to a robbery call at a home on Oakview Street on August 18, 2018. When he arrived, he saw Dyrell Sims, who had been shot, laying in the front yard and the other victim, Bryant James, pressing a towel to his head to stop the bleeding. James told Officer Kirkwood that someone had robbed them while they were on the front porch of the home. Officer Kirkwood said that approximately fifteen to twenty people were present at the scene. He testified that he noticed shell casings at the scene, though he did not collect these shell casings or recover any weapons.

On cross-examination, Officer Kirkwood stated that to his knowledge, none of the bystanders gave a written or recorded statement.

Bryant James, the surviving victim, was a friend of Dyrell Sims and had known him for over twenty-five years. James testified that he went to visit Sims at Sims' mother's home around 5:00 in the afternoon on August 18, 2015. James and Sims sat down on the front porch and talked for about an hour. During that time, James noticed two men standing at the corner of Oakview and a connecting street. James and Sims decided to go get something to eat and began to walk towards the front porch steps. James testified that when they were approaching the steps, the two men he saw on the sidewalk corner "ran up on the porch." One of the men entered the porch from the side and the other came up the front porch steps. James stated that one of the men, later identified as the Defendant, was short and stocky and the other, later identified as codefendant Wilson, was taller with a face tattoo and gold teeth. The Defendant approached James, codefendant Wilson approached Sims, and both men drew their guns. The Defendant told James to "give him

everything." James told the Defendant he did not have anything, and the Defendant proceeded to take seventy to eighty dollars from James' pocket. At this point, the Defendant approached Sims and codefendant Wilson approached James. The Defendant took Sims' phone and a few dollars from his pockets. Codefendant Wilson was holding James by the front of his shirt and pointing his gun at him.

At some point, the struggle moved to the front yard. James stated that he and codefendant Wilson began "tussling" and that he could see Sims struggling with the Defendant. James stated that "[a]t the time Dyrell end up getting up, they was off the porch and, well, I heard a shot. Dyrell swung at him and he was like fighting with him." James testified that codefendant Wilson told the Defendant to "shoot." James was able to push codefendant Wilson off of him and began to run away as codefendant Wilson slid down the incline of the front yard. As James was running away, he saw the Defendant fire three to four more shots at Sims. James stated that shots were also fired at him as he was running away, but that he could not see who was shooting. James ducked behind a car parked on the street. James testified that when he looked back towards the yard, he saw Sims standing but slumped over. Another shot was fired and Sims fell forward. James stated that he did not see who fired the last shot. After a bystander called 9-1-1, Sims ran back to the front yard to check on Sims as the perpetrators fled the scene and rounded the street corner. James knocked on the door of the home to let Sims' mother, who was inside the home, know what was going on. Sims attempted to stand but fell back to the ground. James and Sims' mother attempted to render aid as they waited for the ambulance to arrive. James stated that the entire encounter lasted six to seven minutes.

On cross-examination, James testified that he and Sims' were not smoking or drinking before the encounter. James stated that he did not see the first shots fired, because he was focused on codefendant Wilson, who was pointing a gun at him. During direct examination, James stated that the first shot was a single shot. On cross-examination, James indicated that there were multiple shots. When James heard the first shots, he turned towards the Defendant and Sims and saw them fighting over the gun, with the gun pointing towards the ground. James testified that codefendant Wilson was running past Sims as the final shot rang out.

James spoke with the police officers who arrived at the scene and was transported to a police precinct to give a typed statement. In the statement, James gave descriptions of the perpetrators. James described the Defendant as approximately five foot four with a thin mustache, "stubby but not fat," and in his mid-twenties to early thirties with a "light brown paper sack like complexion." James described codefendant Wilson as five foot eight to five foot nine, in his twenties to early thirties, and noted that he had a darker complexion than the Defendant. James also stated that codefendant Wilson had a "W" tattoo on the side of his face. On September 11, 2015, James identified codefendant Wilson as one of

the perpetrators in a photographic lineup. James noted that it was easy to identify him by his face tattoo. On September 21, 2015, James identified the Defendant in a second photographic lineup. James testified that he did not know either the Defendant or codefendant Wilson prior to the offense in this case.

Detective Michael Spearman testified at trial, reiterating his testimony from the suppression hearing. Detective Spearman also testified that when he entered the interview room, he asked the Defendant if he could talk to him about a case involving a victim named Dyrell Sims. Detective Spearman stated that the Defendant initially stated that he did not know anything about the instant case. Eventually, the Defendant admitted that he had information about the crime and gave his second statement, recounting the events that occurred. In the statement, the Defendant said that two other individuals were involved in the perpetration of the crime: codefendant Wilson, who he referred to as "Dirty," and a driver, who he referred to as "Donnell." Detective Spearman read the Defendant's second statement aloud, including the following excerpt:

> …Dirty called me and asked did I talk to Donnell. I was like naw, I hadn't talked to him. I was like what is going on? He was like, I was about to give you -- give him your number and then y'all come and get me. I was like aight (sic).

> Then Donnell called me like twenty minutes later and then pull up and got me from the Pendleton Place Apartments in his black Benz. Then went to Southern and picked up Dirty. Then he hopped in the car. Donnell started saying that they got a move for us and he said it was going to be sweet. He said the n**** be walking around with about four to five thousand dollars on him. We were on our way over to Glenview. We rode past the street and then seen him back -- and then we see him make -- seen him make a transaction. Then Donnell parked around the corner in front of the school. Me and Dirty got out of the car and walked toward the house that Donnell pointed out when he drove by.

> Dirty ran up on the porch first and said don't move, I'm going to blow your ass off. By that time I then ran up on the other side -- on the other guy and went in his pocket and found a quarter of weed. Dirty was grabbing the money from the big guy. He then walked off and said take me inside the house. I was going toward the big dude and grabbing him and I said where the money at? He said all I got man -- he said that all I got man, I don't, I don't live here, my mama inside of there. By that time I was about to leave the porch and I had my gun in my right hand. The big guy then started to struggle for the gun. While we were struggling some shots went off. I think

I shot him in the leg and somewhere in his side.  Shit, when I knew he was shot I got up and ran.  While I was running I heard some more shots and turned around it was Dirty shooting at them.  We then ran to the car and I got in the passenger side and Dirty got into the back seat.  When we got back in the car Dirty took my gun from me.  Donnell then dropped me off at my grandmomma's house and Dirty stayed in the car with him.

The Defendant's second statement was time stamped at 6:35 in the morning on September 24, 2015.  The Defendant was given an opportunity to make corrections and subsequently signed and initialed the statement.

On cross-examination, Detective Spearman testified that he did not audio or video record his interrogation of the Defendant because it is the policy of the MPD not to record.  He stated that he had not been trained that there are downsides to recording interrogations.  Detective Spearman admitted that he knew what he wanted to hear from the Defendant before he began interviewing him.  He said that although he told the Defendant he was not accusing him of anything and that he was not under arrest, he believed that the Defendant was a suspect in the instant case and intended to charge him with first-degree murder, regardless of what he said during the interrogation.

Detective Spearman testified that after reviewing Bryant James' initial statement, he had remaining questions.  Bryant James told Spearman that the perpetrators had used semi-automatic weapons during the crime, which would leave shell casings behind, yet no casings were recovered by the crime scene investigator.  Detective Spearman met with James at a Burger King ten days after the crime to ask him follow up questions.  The following day, Detective Spearman spoke with James on the phone and asked him to provide descriptions of the perpetrators.  Detective Spearman confirmed that during this conversation, James told him that one of the suspects had dreadlocks.  However, in the photo line ups that James viewed, neither the Defendant, nor codefendant Wilson, had dreadlocks.

On re-direct examination, Detective Spearman testified that he did not tell the Defendant what to say in his second statement.  Detective Spearman stated that no guns were recovered in this case.

On re-cross examination, Detective Spearman confirmed that Bryant James was the only witness to give a formal statement to law enforcement.

J.R. Rector, an MPD crime scene investigator, was assigned to process the crime scene at Oakview.  When he arrived, he spoke to the officers who were present, gathered

background information on Sims, and began to process the scene. Officer Rector completed a grid search of the scene for shell casings but did not recover any.

On cross-examination, Officer Rector clarified that as a crime scene investigator, he works at the request of case investigators. In this case, he was working under the direction of Detective Spearman. Officer Rector testified that he was not asked to collect fingerprints, blood, or anything else that could contain DNA from the crime scene.

Dr. Marco Ross, the deputy chief medical examiner at West Tennessee Regional Forensic Center, performed Sims' autopsy. Dr. Ross testified that Sims' had five gunshot wounds. He identified one of the wounds, to the back of the head, as the fatal shot. Dr. Ross stated that the trajectory of this wound was consistent with Sims standing bent forward towards the shooter as the shot was fired. The second wound was to the torso. Dr. Ross stated this wound was potentially fatal, but not as fatal as the head wound. The three other wounds, located on the hips and thighs, were not fatal in nature. Dr. Ross was unable to determine the order that the injuries were sustained. He determined that the cause of death was multiple gunshot wounds and that the manner of death was homicide. Additionally, Dr. Ross stated that a test of Sims blood showed the presence of cannabinoids.

On cross-examination, Dr. Ross stated that the autopsy was performed on August 22, 2015, the day after Sims died. He said that either the head wound or the torso wound alone could have caused Sims' death, without the other wounds. He did not inspect the clothing that Sims was wearing when he was shot because the clothing was not provided to him. Dr. Ross explained that it is impossible to tell when Sims smoked or ingested cannabinoids from the blood test results.

Following the proof at trial, the Defendant was convicted of the lesser charge of criminally negligent homicide in Count 1. Tenn. Code Ann. § 39-13-212. He was convicted of the lesser charge of facilitation of aggravated assault in Count 2. Id. § 39-11-403, 39-13-102. He was found not guilty of employing a firearm during a robbery in Count 3. He was found guilty of aggravated robbery in Count 4. Id. § 39-13-402. Subsequently, at the sentencing hearing, the Defendant was given an effective sentence of 10 years imprisonment. The Defendant filed a "Motion for Judgment of Acquittal or, in the Alternative, a New Trial," which was overruled following a hearing. The Defendant filed a timely notice of appeal on July 17, 2019.

## ANALYSIS

**I. Motion to Suppress.** The Defendant claims that the trial court erred in denying his motion to suppress the incriminating statement he gave law enforcement, arguing that:

(1) his waiver of the right to be free from self-incrimination and statement were not knowing, voluntary, and intelligent; (2) law enforcement elicited his statement during custodial interrogation without adequately advising him of his right to be free from self-incrimination; and (3) law enforcement elicited his statement without the presence of counsel.

This Court will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise. State v. McCormick, 494 S.W.3d 673, 678 (Tenn. 2016) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). On appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn.1998)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. Our review of a trial court's application of law to the facts is de novo, with no presumption of correctness. McCormick, 494 S.W.3d at 678. When the trial court's findings of fact are based entirely on evidence that does not involve issues of witness credibility, however, appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions and the trial court's findings of fact are subject to de novo review. State v. Clark, 452 S.W.3d 268, 282 (Tenn. 2014) (citing State v. Northern, 262 S.W.3d 741, 748 n.3 (Tenn. 2008); State v. Payne, 149 S.W.3d 20, 25 (Tenn. 2004)). The trial court's determination at the suppression hearing that a confession was voluntary is presumptively correct on appeal. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). Further, we note that in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial. State v. Thacker, 164 S.W.3d 208, 248 (Tenn. 2005).

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. However, an accused may waive the right against self-incrimination, assuming the waiver is made voluntarily, knowingly, and intelligently. State v. Climer, 400 S.W.3d 537, 557 (Tenn. 2013) (citing Miranda v. Arizona, 384 U.S. 436, 479 (1966)). Pursuant to Miranda, a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." State v. Lowe, 552 S.W.3d 842, 866 (Tenn. 2018) (quoting Miranda v. Arizona, 384 U.S. 436, 479 (1966)).

The Defendant makes three arguments to support his claim that the trial court erred in denying his motion to suppress the incriminating statement he made to law enforcement. Each of these arguments, while based in different bodies of law, relate to whether the defendant was adequately advised of his Miranda rights before he was questioned by Detective Spearman. The Defendant claims that the State failed to offer credible testimony to prove Detective Spearman advised him of his constitutional rights, arguing that inconsistencies in Detective Spearman's testimony make him an unreliable witness. Specifically, the Defendant notes that Detective Spearman's supplement states the Defendant signed a second separate advice of rights form prior to interrogation, though Spearman admitted he failed to use a second separate advice of rights form, and the advice of rights form utilized by Lieutenant Sewell does not contain a second signature. Essentially, the Defendant asks us to completely disregard Detective Spearman's testimony.

However, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld." State v. Odom, 928 S.W.2d 18. 23 (Tenn. 1996).

Here, the trial court found that before questioning began, Detective Spearman used the advice of rights form that Lieutenant Sewell previously completed and had the Defendant read it aloud. The evidence supports this finding. Detective Spearman testified to this fact at the suppression hearing, and no contradictory or conflicting proof was offered by the Defendant. Though the Defendant correctly notes that no written waiver of rights was completed before he was questioned, the record adequately supports, and the trial court correctly found, that Detective Spearman *orally* advised him of his Miranda rights before interrogation began.

Additionally, the trial court also found that before the Defendant gave his formal statement, he was advised of his rights and initialed next to each right listed on his second statement, a fact that the Defendant does not dispute. Detective Spearman testified that the Defendant initialed by the rights listed on his second statement at 5:20 in the morning. The Defendant's statement was time stamped at 6:35 in the morning. We conclude that the Defendant was adequately advised of his constitutional rights, waived them prior to speaking with law enforcement, and gave a written statement.

**a. Knowing, Voluntary, and Intelligent.** The Defendant asserts that under the totality of the circumstances, his waiver of the right to be free from self-incrimination and his later statement were not made knowingly, voluntarily, and intelligently. Specifically, the Defendant notes that law enforcement did not tell him the subject of interrogation before questioning began. The Defendant also contends that law enforcement used deception tactics to elicit his statement without adequately advising him of his Miranda rights. The State responds that the Defendant was explicitly informed both of the subject of interrogation and his rights.

A court must look to the totality of the circumstances in determining whether a defendant has validly waived his Miranda rights. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn.1992) (citations omitted). A court should consider the following when looking at the totality of the circumstances: The age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. State v. Huddleston, 924 S.W.2d 666, 671 (Tenn.1996) (citations omitted).

First, we address the Defendant's contention that his waiver could not have been knowing because he "did not have 'any idea' what Detective Spearman wanted to speak with him about." This court has held that "the failure of law enforcement officials to inform a suspect of all the possible subjects of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his or her Fifth Amendment privilege." State v. Green, 995 S.W.2d 591, 600 (Tenn. Crim. App. 1998) (citing Colorado v. Spring, 479 U.S. 564 (1987)). Furthermore, the record indicates that the Defendant was informed of the subject of questioning before interrogation began. At trial, Detective Spearman testified that when he entered the interview room, he told the Defendant that he wanted to "talk about a case that was concerning our victim, Dyrell Sims."

Next, the Defendant claims that "the police employed deception to elicit statements from [him] without a knowing, intelligent, and voluntary waiver of his rights . . . ." The Defendant implies that police brought him into the station under the pretense of questioning him about the "Scooter" case with the intent to subsequently charge him in the instant case. The Defendant notes Lieutenant Sewell's inconsistent testimony regarding whether he knew the Defendant was a suspect in the instant case. However, as noted by the trial court, Detective Spearman was not at the homicide office when the Defendant was brought in for

questioning on the "Scooter" case. Further, deception by law enforcement does not, alone, render a statement involuntary. State v. Smith, 933 S.W.2d 450, 455-65 (Tenn. 1996). Rather, the question is, under the totality of the circumstances, "'whether the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined....'" Id. at 465 (quoting State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980).

Looking to the totality of the circumstances, we conclude that the Defendant's waiver of rights and subsequent statement were made knowingly, voluntarily, and intelligently. First, as discussed above, the record and proof presented at trial show that the Defendant was adequately advised of his rights. Turning to the remaining factors, the Defendant was accompanied to the homicide office by family members, offered bathroom breaks, given food and water, and officers testified that he did not appear to be tired or under the influence. Though the Defendant was nineteen years old at the time of questioning and had little experience with law enforcement, nothing in the record indicates that he was incapable of understanding his Miranda rights. Additionally, the Defendant does not allege that he was abused or threatened by law enforcement.

Lastly, the Defendant argues that this court should consider the absence of audio or video record of his statement in our analysis. As the trial court correctly noted, "there is no constitutional requirement under the Tennessee Constitution or the United States Constitution which requires the [D]efendant's confession to be recorded." Upon reviewing the totality of the circumstances, we conclude that the Defendant waived his constitutional rights and subsequently made a statement.

**b. Right to be Free from Compelled Self-Incrimination**. The Defendant argues that police elicited his statement during custodial interrogation without adequately advising of his right to be free from compelled self-incrimination. He claims that the Miranda warnings Lieutenant Sewell provided were not sufficient to adequately advise him of his rights in the instant case, that new warnings were required, and that the record does not prove that he received renewed warnings. In response, the State argues that the warnings provided by Lieutenant Sewell were sufficient, that the Defendant's waiver of rights remained valid when he was interrogated by Detective Spearman, and further, that Detective Spearman provided the Defendant with renewed warnings.

First, the State does not dispute the trial court's finding that the Defendant was in custody when he was interrogated by Detective Spearman. Next, we must determine whether Detective Spearman was required to readvise the Defendant of his Miranda rights before questioning him about the instant case. "A valid waiver of Miranda rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing

and intelligent waiver of his rights." State v. Rogers, 188 S.W.3d 593, 606 (Tenn. 2006) (citing Wyrick v. Fields, 459 U.S. 42, 47 (1982)). "Courts must examine the totality of the circumstances to determine whether renewed warnings are required." Id. The circumstances to be examined include but are not limited to:

> 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights.

Id.

In its order denying the Defendant's motion to suppress, the trial court implicitly found that the renewed warnings were not required before Detective Spearman began questioning the Defendant. The trial court found that the length of time between the Defendant's initial waiver of rights and his second interview with Detective Spearman, three hours, was insignificant. Additionally, the trial court noted that although the identity of the interrogator and the subject of the interrogation changed, the Defendant remained in the same room for both interviews and was in continuous police presence. However, the trial court failed to analyze the circumstances that indicate renewed warnings were required. The Defendant was nineteen years of age and had no previous experience with law enforcement. Since the Defendant was determined to be a witness in the "Scooter" case and a suspect in the instant case, the tone of questioning changed substantially between the first and second interview. Most importantly, when Mirandizing the Defendant, Lieutenant Sewell explicitly stated that these rights were specific to the "Scooter" case, conceivably leading the Defendant to believe that these rights, and his waiver of these rights, did not apply to his second interrogation with Detective Spearman. Though we note that it is a close call, we conclude that the circumstances had so seriously changed that the Defendant's initial waiver of rights was no longer valid.

More important to our analysis is the trial court's finding that the Defendant did, in fact, receive renewed warnings before he was questioned about the instant case. As previously noted, the trial court found that Detective Spearman utilized the advice of rights form used by Lieutenant Sewell before questioning began. Though the Defendant correctly notes that no written waiver exists to document the renewed warnings, "the law does not require a written waiver." State v. Mann, 959 S.W.2d 820, 823 (Tenn. Crim. App. 1986). Based on the above analysis, we conclude that the Defendant received renewed warnings and was adequately advised of his right to be free from compelled self-incrimination.

**c. Statement Elicited Without Counsel.** The Defendant contends that police improperly elicited his statement in the absence of counsel. In response, the State argues that the right to counsel had not attached because the adversarial judicial process had not begun. Additionally, the State claims that even if the right to counsel had attached, the Defendant was adequately advised of his constitutional rights and chose to waive them.

The Sixth Amendment of the United States Constitution ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. In Tennessee, the Sixth Amendment right to counsel attaches when judicial proceedings are initiated. State v. Frasier, 914 S.W.2d 467, 469 (Tenn. 1996) (citing State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980)). Initiation is marked by formal charge, which includes indictment when the charge is initiated by a grand jury. Id. "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." Montejo v. Louisiana, 556 U.S. 778, 786 (2009) (citing United States v. Wade, 388 U.S. 218, 227-28 (1967); Powell v. Alabama, 287 U.S. 45, 57 (1932)). Interrogation by the State is considered a "critical" stage of the criminal proceedings. Id. (citing Massiah v. United States, 377 U.S. 201, 204-05 (1964); United States v. Henry, 447 U.S. 264, 274 (1980)).

The Tennessee Supreme Court has held that "the right to counsel attaches 'at the time an arrest warrant issues, a preliminary hearing is held (if no arrest warrant is issued), or an indictment or presentment is returned.'" State v. Jackson, 889 S.W.2d 219, 222 (Tenn. Crim. App. 1993) (citing State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980)).

Adversarial judicial proceedings had not yet begun when the Defendant was questioned by Detective Spearman about the instant case. No arrest warrant had been issued, no preliminary hearing had been held, and there had been no indictment. The Defendant argues that by creating an arrest ticket before interrogation began, "the police sought to skirt the bounds of the law, which requires the State to provide [him] with counsel once formal proceedings have begun." The Defendant implies that an arrest ticket is the equivalent of an arrest warrant, however, he provides no analysis to support this claim.

In any case, as discussed above, the Defendant was adequately advised of his constitutional rights before he was questioned by Detective Spearman. The Defendant chose to waive these rights and never requested an attorney during his interaction with Detective Spearman. No relief is warranted.

After reviewing each of the Defendant's arguments in turn, we determine that the trial court properly denied the Defendant's motion to suppress. The Defendant is not entitled to relief on this issue.

**II. Sufficiency of the Evidence**. The Defendant argues that without his incriminating statement to law enforcement, the evidence is insufficient to maintain his convictions. In response, the State contends that the Defendant's statement was properly admitted, and that, even without the statement, the testimony of Bryant James is sufficient evidence to support the convictions. We agree with the State.

The Defendant does not challenge any specific element of the crimes with which he was charged. Instead, the extent of the Defendant's argument is that without his statement, "the only evidence tying him to Mr. Sim's homicide is Bryant James's identification of him in a photo lineup." The Defendant contends that the "identification should carry little weight." The Defendant notes that James described the Defendant as shorter and darker-complected than co-defendant Wilson and claims that this description is inaccurate. This is the only evidence the Defendant provides to discredit James' identification. The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as triers of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). Accordingly, this court will not reweigh James' testimony or substitute the inferences drawn by the jury with our own. State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). We conclude that the evidence was sufficient to support each of the Defendant's convictions.

## CONCLUSION

Upon review, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE

- 18 -